Irving and Charlotte RADOL, et
al., Plaintiffs,

v.

W. Bruce THOMAS, et al., Defendants.

No. C–1–82–13.

United States District Court,
S.D. Ohio, W.D.

Feb. 2, 1983.

See also, D.C., 534 F.Supp. 1302.

Jacob Stein, Cincinnati, Ohio, for plaintiffs.

John W. Beatty, Cincinnati, Ohio, for defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

CARL B. RUBIN, Chief Judge.

This case involves the takeover of Marathon Oil Company ("Marathon") by United States Steel ("Steel"). This matter is before the Court on two Motions for Partial Summary Judgment, one by those defendants connected with Marathon and one by those defendants connected with Steel. As the arguments contained in each are virtually identical, the two Motions will be addressed as one. The Motion seeks summary judgment on all of plaintiffs' claims under the federal securities laws.

*Facts* [1]

The facts will be briefly summarized here. Where necessary, they will be expanded in the Court's discussion *infra.*

On October 30, 1981, the Mobil Corporation announced an offer to purchase up to 40 million Marathon shares for $85.00 per share in cash. The Directors of Marathon determined to resist the tender offer. In connection with this effort, they retained First Boston Corporation ("First Boston") to investigate specific alternatives to the Mobil offer, including the location of potential "white knights." [2]

As early as June of 1981, the management of Marathon made plans to resist a hostile takeover. An internal document variously referred to as the "Strong Report" and the "internal asset valuation" was prepared as an inventory of corporate assets with an estimation of their value. At approximately the same time, First Boston was directed to prepare a valuation of Marathon assets based solely upon information available to the public. The Board of Directors was advised of the conclusions reached in both the internal asset valuation and the First Boston appraisal at a board meeting held on October 31, 1981. During its negotiations with Marathon prior to the actual tender offer, United States Steel was also provided with copies of these reports.

The reports contained value estimates of Marathon's proven, probable and possible oil reserves. The values in the two reports

---

1. *See also Radol v. Thomas,* 534 F.Supp. 1302, 1304–06 (S.D.Ohio 1982) (Findings of Fact on Motion for Preliminary Injunction).

2. The term "white knight" refers to an alternative merger partner toward whom a corporation's management is friendly.

varied by billions of dollars. The First Boston Report gave an "asset valuation" of $189 to $226 per share; the Strong Report valued Marathon's assets at $276 to $323 per share. The calculations used in arriving at the values involved factors such as original cost, carrying cost, replacement cost and discount cash flow. The calculations were based on speculation and assumptions which included economic predictions as far as 50 years into the future and projections of the future price of oil. Although the reports were prepared by experts, the methods used in calculating these values were necessarily imprecise.

The reports were not prepared in the ordinary course of business. Instead, they were intended to be "selling documents" for use in attracting more favorable tender offers.

The Board of Directors considered the Mobil offer to be "grossly inadequate" and made a diligent effort to develop an alternative transaction by contacting other corporations potentially interested in acquiring Marathon. During the same period of time, the United States Steel Corporation was seeking to diversify its holdings and was considering the acquisition of Marathon, among other investments. Steel apparently initiated the conversations with Marathon after the Mobil offer had been made. Discussions between Marathon and Steel began on November 9, 1981, and resulted in an Agreement of Merger signed on November 18. The negotiations were carried out at a

time when the Mobil tender offer remained open.

The Steel tender offer was made public on November 19, 1981. Under the terms of the tender offer, Steel proposed to pay $125.00 in cash for 30,000,000 or approximately 51.12% of Marathon's outstanding shares. For all other shares, both those tendered and not accepted, and those not tendered, Steel proposed a subsequent merger between Marathon and a wholly-owned subsidiary of Steel whereby each share of Marathon stock would be exchanged for a 12½%, twelve-year note of Steel with a face value of $100.[3]

Fifty-three million, eight-hundred eighty thousand, three hundred-sixty (53,880,360) Marathon shares, representing 91.18% of the total outstanding, were tendered in response to U.S. Steel's offer.[4] On March 11, 1982, the merger of Marathon and a wholly-owned subsidiary of Steel was approved at a Marathon shareholders' meeting by the required two-thirds majority.[5] The second step of the Marathon-Steel Merger Agreement was subsequently carried out as planned.

Shareholders were first advised of the existence of the internal and First Boston asset valuations in the proxy statement relating to the merger vote, dated February 8, 1982. The proxy statement disclosed the range of net equity values of Marathon per share arrived at by each of the reports, and contained a disclaimer by the Board in each instance as to the reliability and relevance of the reports.[6]

---

3. No precise value can be placed on these securities. At the end of 12 years, they will be exchangeable at par. At the time of the merger agreement, their value was deemed to be $86.00.

4. The original period for the U.S. Steel tender offer was extended by The United States Court of Appeals for the Sixth Circuit in *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir. 1981). In that action, Mobil challenged certain options granted to U.S. Steel in the Agreement of Merger. Under the Agreement, U.S. Steel was granted an option to purchase up to 10,000 common shares of Marathon for $90.00 per share, and an option to purchase Marathon's interest in the Yates Field for $2.8 million, if U.S. Steel's tender offer failed and another cor-

poration succeeded in acquiring a majority interest in Marathon. The United States Court of Appeals for the Sixth Circuit invalidated these "lock-up options" under § 14(e) of the Exchange Act. 15 U.S.C. § 78n(e) (1981).

5. On March 9, 1982, this Court denied a Preliminary Injunction to enjoin the proposed merger. See *Radol, supra.*

6. Specifically, the Board stated that the reports "were not viewed by Marathon's Board of Directors as being reflective of, and do not represent, per share values that could realistically be expected to be received by Marathon or its shareholders in a negotiated sale of the company as a going concern or through liquidation of the company's assets." (Pltfs.' Ex. I(D) p. 13).

Plaintiffs brought a class action, alleging, *inter alia,* various violations of the federal securities laws. Defendants have now moved for summary judgment with respect to those federal securities laws claims. The allegations at issue involve four main assertions, each of which will be dealt with separately.

### Effect of Denial of Preliminary Injunction

This Court has previously denied plaintiffs' Motion for a Preliminary Injunction in this matter. *Radol v. Thomas,* 534 F.Supp. 1302 (S.D.Ohio 1982). Many, if not all, of the issues involved in the present motion were considered by the Court in connection with that earlier motion. It should be noted, however, that the applicable legal standard in considering a Motion for Preliminary Injunction—strong or substantial likelihood or probability of success on the merits—differs from the summary judgment standard. Therefore, the Court's earlier opinion does not necessarily control its consideration of this motion. See *Radol, supra* at 1318 (limited nature of Court's decision).

### Summary Judgment Standard

The summary judgment standard in this Circuit is a stringent one. Federal Rule of Civil Procedure 56(c) permits the Court to grant summary judgment only when there is no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); *Watkins v. Northwestern Ohio Tractor Pullers,* 630 F.2d 1155, 1158 (6th Cir.1980). The Court may not make findings of disputed facts on a Motion for Summary Judgment. *Watkins, supra.* The movant has the burden of showing conclusively that there exists no genuine issue as to a material fact, and the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion. *Id.* The movant's papers are to be closely scrutinized, while those of the opposing party are to be viewed indulgently. *Id.* The Court will consider this Motion in accordance with the foregoing considerations.

### Two-tier Merger As A Manipulative Device

Defendants seek summary judgment on plaintiffs' claim that the two-tier merger of Marathon and Steel was coercive and a manipulative device, in violation of Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).[7] Plaintiffs assert that there exist genuine issues of material fact with respect to this issue. The Court disagrees.

Plaintiffs' claim centers on the contention that the disparity in value between the $125.00 per share offered on the front end of the merger arrangement and the Steel notes exchanged on the back end acted to coerce Marathon shareholders into tendering at the front end in order to avoid a later freeze out at the lower value. This alleged coercion, according to plaintiffs, acted as a

---

7. Section 10(b) provides:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   .   .   .   .   .

   To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Section 14(e) provides, in pertinent part
   It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

manipulative device in violation of §§ 10(b) and 14(e) by effectively depriving Marathon shareholders of the option of holding their shares for long-term appreciation and by contributing to "inefficiency in investment decisions." Plaintiffs rely on *Mobil Corp. v. Marathon Oil Co., supra,* in which The United States Court of Appeals for the Sixth Circuit held that two options granted by Marathon to Steel as part of the original merger agreement constituted "manipulative devices" in violation of § 14(e).

Plaintiffs reliance on *Mobil* is misplaced. The options involved in that case were an irrevocable option to purchase 10 million authorized but unissued shares of Marathon stock and an option to purchase Marathon's 48% interest in oil and mineral rights in the Yates Field. This latter option could be exercised only if Steel's offer did not succeed and a third party acquired control of Marathon. Thus, in effect, a competing offeror was precluded from acquiring Yates Field in a merger with Marathon. *Mobil, supra,* at 367. The Court concluded that these options prevented all other potential offerors from competing on equal footing with Steel, *id.* at 375, 376, and stated that the options, individually and in tandem, had the effect of "circumventing the natural forces of market demand in this tender offer contest." *Id.* at 376. The Court also held that the fact that the options were fully disclosed did not prevent their being "manipulative devices" in violation of § 14(e). *Id.* at 376–77. The Court concluded its discussion with a word of caution:

> In so ruling, we do not purport to define a rule of decision for all claims of manipulation under the Williams Act, or indeed for all forms of options which might be claimed to "lock up" takeover battles or otherwise discourage competing tender offers. *Id.* at 377.

The situation at bar is not governed by *Mobil.* The two-tier tender offer and merger at issue here did not "circumvent the natural forces of market demand" in the manner of the options in *Mobil.*

As this Court has noted, any tender offer is likely to be coercive to some degree. *Radol, supra,* at 1312. The degree of "coerciveness" may increase as the disparity between the front end and back end of the transaction grows. Yet the Court is aware of no case in which such a disparity has been the basis for a finding of a violation of § 10(b) or § 14(e).

It is also clear that the two-tier arrangement did not discourage competing offerors. Mobil, in fact, responded to Steel's offer with an offer of its own, similar in price and structure. See, *Radol, supra,* at 1313.

While it may be true that "[t]he methods and techniques of manipulation are limited only by the ingenuity of man," *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir. 1971), *cert. denied,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972), it remains the case that "manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) (citations omitted). The term does not cover all situations where shareholders may have been treated unfairly, *id.* at 477, 97 S.Ct. at 1302, and it does not cover the two-tier tender offer and merger at issue here.

This conclusion is buttressed by the fact that Congress has, by implication, acknowledged the existence of two-tier transactions and has regulated but not outlawed them, *see* 17 C.F.R. § 240.13e–3, and by the fact that the Court in *Mobil, supra,* allowed this very arrangement to proceed after striking out the invalid options. *See generally Radol, supra,* at 1312–13.

On this issue, defendants' Motion for Partial Summary Judgment will be granted.[8]

---

8. Plaintiffs argue that several individuals' opinions that the arrangement here was "coercive" or "manipulative" provide triable issues of fact which preclude summary judgment. This is not the case. The material facts are the details of the two-tier transaction, which are undisput-

### Tender Offer Materials As Proxy Solicitations

■ Defendants also seek summary judgment on plaintiffs' claim that defendants' communications at the time of the tender offer are, in effect, proxy solicitations which violate § 14(a), 15 U.S.C. § 78n(a).[9] Plaintiffs first note defendants' argument that the two-tier tender offer and merger arrangement must be considered a unitary transaction for purposes of assessing the fairness of the deal. Plaintiffs then contend that the arrangement must also be considered a unitary transaction with respect to the application of proxy rules. They argue that, as a practical matter, shareholders were faced with the decision of whether to approve the merger at the time of the tender offer. Therefore, the materials disseminated by defendants in connection with the tender offer were, in effect, proxy solicitations. The Court disagrees with plaintiffs' reasoning.

While it may be appropriate to consider the two-step transaction as unitary for the purpose of assessing its fairness,[10] it does not follow that it should be considered unitary with respect to the application of the proxy rules of § 14(a).

In evaluating the fairness of the choice confronting shareholders, it is clear as a matter of logic that the two options must be considered together. Shareholders were free either to tender or to accept the terms of the merger. Fairness must therefore be considered in the context of both available options, considered as a whole.

However, as this Court has previously noted, "a tender offer and subsequent merger are distinct acts with separate con-

cerns toward which the securities laws and SEC Rules are directed in their regulatory schemes." *Radol, supra,* at 1314. Therefore, it is entirely appropriate to consider each step in such a transaction separately.

It is clear that the statements made in the tender offer and in the November 19, 1981, letter to Marathon shareholders from Director Hoopman were made in compliance with the securities laws and SEC Rules pertaining to tender offers. *Id.* As the Court has stated,

> To comply with these rules, U.S. Steel and Marathon referred to the merger agreement which would be proposed if the tender offer was successful. These references were not the equivalent of solicitations for the merger which would call forth application of the full panoply of the proxy rules. The proxy rules were applicable only when the merger step of the transaction began. *See Sheinberg v. Fluor Corp.,* 514 F.Supp. 133, 138 (S.D.N.Y.1981). *Id.* (footnote omitted).

Here again, summary judgment is appropriate. The "material facts" are the tender offer and the materials distributed in connection therewith. The dispute involves a purely legal question. On this claim, defendants' Motion will be granted.

### Rule 13e–3 and the Tender Offer

■ The third issue on which defendants seek summary judgment involves plaintiffs' claim that SEC Rule 13e–3 [11], dealing with going private transactions, applied to the tender offer stage of the two-tier arrangement and required disclosure, at that time, of the First Boston and internal valuations, and plaintiffs' claim that the fairness opin-

---

ed. The question of whether these facts constitute manipulative acts or practices is a question of law, amenable to disposition by summary judgment.

9. Section 14(a) provides

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

10. The Court expresses no opinion on the fairness of the transaction, an issue not before it at this time.

11. 17 C.F.R. § 240.13e–3.

ions required by that Rule to be contained in the proxy statement were inadequate. On these claims, the Court finds that defendants are entitled to summary judgment.

As noted in *Radol, supra,* at 1304, it is undisputed that Rule 13e–3 applied to the merger stage of this transaction, and that defendants purported to comply with the Rule in their proxy statement. Plaintiffs claim, however, that the Rule also applied to the tender offer stage and required disclosure, in Steel's tender offer and supporting solicitations, of the First Boston and internal valuations.

Rule 13e–3 prohibits "fraudulent, deceptive or manipulative acts or practices," in connection with a going private transaction, by the issuer or an affiliate of the issuer, and sets forth certain requirements pertaining to filing, disclosure and dissemination of information in connection with such a transaction. *Radol, supra,* at 1310. *See also* 17 C.F.R. § 240.13e–3. "Affiliate of an issuer" is defined as

> A person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such issuer. *For the purposes of this section only, a person who is not an affiliate of an issuer at the commencement of such person's tender offer for a class of equity securities of such issuer will not be deemed an affiliate of such issuer prior to the stated termination of such tender offer and any extensions thereof.* 17 C.F.R. § 240.13e–3(a)(1) (emphasis added).

Plaintiffs contend that Steel was an affiliate of Marathon because, one day prior to the commencement of the tender offer, Steel allegedly acquired the requisite control over Marathon by means of the merger agreement entered into by the two companies. Additionally, they argue that the issue of control involves a factual determination which precludes the granting of summary judgment. In so arguing, they rely on SEC Release No. 34–17719, [1981] 2 Fed. Sec.L.Rep. (CCH) ¶ 23,709, which states:

> The existence of a control relationship with [the target company] does not turn solely upon the ownership of any specific percentage of securities. Rather, the question is whether there is the ability, directly or indirectly, to direct or cause the direction of the management and policies of [the target company], whether through the ownership of voting securities, *by contract* or otherwise. *Id.* at pp. 17, 245–35 and 36, n. 28 (emphasis added).

Plaintiffs argue that the negative covenants contained in the merger agreement gave Steel control over Marathon "by contract" within the meaning of the language quoted above.

The Court disagrees and holds that, as a matter of law, the negative covenants in question did not create in Steel a sufficient "ability, directly or indirectly, to direct or cause direction of the management and policies" of Marathon to rise to the level of control. Those covenants essentially required Marathon only to refrain from extraordinary corporate activity pending the merger and to use its best efforts to preserve intact its business organization. *Radol, supra,* at 1310. *See also id.* at n. 7 (description of specific covenants.)

Since Steel did not control, and was therefore not an affiliate of, Marathon at the commencement of the tender offer, Steel falls within the explicit exception created by the second sentence of Rule 13e–3(a)(1). As a result, Steel was not an affiliate of Marathon during the period of the tender offer, and Rule 13e–3 did not apply to that stage of the transaction. Consequently, that Rule did not require disclosure of the First Boston and internal valuations at that time.

Plaintiffs also claim that the "fairness opinions" disclosed in the proxy statement by defendants pursuant to Rule 13e–3[12]

---

**12.** Rule 13e–3(e)(I) requires the disclosure of various items listed in Schedule 13e–3, 17 C.F.R. § 240.13e–3. Item 8(a) of Schedule 13e–3 requires that the proxy statement "[s]tate whether the issuer or affiliate ... reasonably believes that the Rule 13e–3 transaction is fair or unfair to unaffiliated security holders." The statement is also required to

were inadequate. They argue, in essence, that the fairness opinions [13] related to the transaction as a whole and not to the merger *per se* and were therefore misleading.

This issue was considered in *Radol, supra,* at 1316–17. Upon re-examination, the Court finds no reason to deviate from that reasoning, which will not be repeated here. The Court concludes that the fairness opinions contained in the proxy materials were not materially misleading.

On the issues of the applicability of Rule 13e–3 to the tender offer and the sufficiency of the fairness opinions contained in the proxy materials, summary judgment will be granted for defendants.

*Failure to Disclose Asset Valuations Under §§ 10(b) and 14(e) and Rule 10b–5*

■ The last major issue on which defendants seek summary judgment involves plaintiffs' contention that the failure to disclose the First Boston and internal asset valuations in the tender offer materials violated §§ 10(b) and 14(e) and Rule 10b–5.[14] Plaintiffs argue that the question of the materiality of the asset valuations must be submitted to a jury. Defendants contend that the valuations, based as they were on imprecise calculations and predictions, did not, as a matter of law, rise to the level of materiality. Here, in the context of a summary judgment motion, the Court agrees with plaintiffs.

As is evident from the language of § 14(e) and Rule 10b–5, omissions must involve *material* facts in order to be actionable. In *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2132–33, 48 L.Ed.2d 757 (1976), the Supreme Court discussed materiality,[15] stating

The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. (footnotes omitted).

The *Northway* Court also formulated a general standard of materiality:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* [16] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted

---

"[d]iscuss in reasonable detail the material factors upon which the belief . . . is based and, to the extent practicable, the weight assigned to each such factor." *Id.* at Item 8(b).

**13.** For the text of the fairness opinions, see *Radol, supra,* at 1316.

**14.** Sections 10(b) and 14(e) are set out *supra,* n. 7. Rule 10b–5 provides

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**15.** *Northway* involved Rule 14a–9, 17 C.F.R. § 240.14a–9. However, the language of that Rule mirrors the operative language here in all significant respects and the *Northway* discussion is pertinent. *See, e.g., James v. Gerber Products Co.,* 587 F.2d 324, 327 (6th Cir.1978).

**16.** *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 449, 96 S.Ct. at 2132 (footnote omitted). The Court cautioned, however, that "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *Id.* at 448, 96 S.Ct. at 2132.

In *James v. Gerber Products Co.,* 587 F.2d 324 (6th Cir.1978), The United States Court of Appeals for the Sixth Circuit was confronted with a case involving nondisclosure of interim earnings figures. The Court stated, "Such sales figures, projections, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." *Id.* at 327. Defendants place heavy reliance on this statement, arguing that the asset valuations here, involving projections of up to half a century hence, reflect too great a level of uncertainty to meet the legal test of materiality.

The Court is unconvinced that the asset valuations are, as a matter of law, not material. It is conceivable that a "reasonable shareholder" would have accorded the valuations "actual significance" in his deliberations, even if disclosure would not have altered his decision. *See Northway, supra,* at 449, 96 S.Ct. at 2132. In any event, this is a question that is best left to a jury. *Id.* at 450, 96 S.Ct. at 2133. On this issue, defendants are not entitled to judgment as a matter of law, and summary judgment will be denied.[17]

---

**17.** This result is not inconsistent with the Court's earlier conclusion in *Radol, supra.* There, it was held that plaintiffs had failed to show a substantial likelihood of success on this materiality issue. *Radol, supra,* at 1308. That ruling was confined to the context of injunctive relief, *id.* at 1318, and does not dictate the decision here.

### Remaining Claims

Defendants also seek summary judgment on plaintiffs' remaining claims under the federal securities laws. The Court has examined these claims, which may be characterized as secondary, and the arguments of both sides, and concludes that, as to them, there exist no genuine issues of material fact and that defendants are entitled to judgment as a matter of law. On these remaining federal claims, summary judgment will be GRANTED.

### Summary

For the reasons given above, the Court rules as follows on Defendants' Motion for Partial Summary Judgment:

With respect to the issue of whether the two-tier tender offer and merger was a manipulative device in violation of §§ 10(b) and 14(e), the Motion is hereby GRANTED.

With respect to the issue of whether the tender offer materials were proxy solicitations which violated § 14(a), the Motion is hereby GRANTED.

With respect to the issue of whether Rule 13e–3 applied to the tender offer stage of the two-tier transaction, the Motion is hereby GRANTED.

With respect to the issue of the adequacy of the proxy statement "fairness opinions," the Motion is hereby GRANTED.

With respect to the issue of the failure to disclose the First Boston and internal asset valuations at the tender offer stage, the Motion is hereby DENIED.

With respect to all remaining federal securities laws claims, the Motion is hereby GRANTED.

IT IS SO ORDERED.