Kevin D. **FLYNN**, John H. Jacobs, and John J. DeLuca. On behalf of themselves and all others similarly situated, Appellants,

v.

**BASS BROTHERS ENTERPRISES, INC.** National Alfalfa Dehydrating and Milling Company, Anne H. Bass, Anne T. Bass, Edward P. Bass, Nancy Lee Bass, Perry R. Bass, Robert M. Bass, Sid R. Bass, W. Fred Massey, Charles R. Peterson, and Richard E. Rainwater.

No. 83–1725.

United States Court of Appeals, Third Circuit.

Argued June 11, 1984.

Decided Sept. 25, 1984.

As Amended Oct. 9, 1984.

Stuart H. Savett, David H. Weinstein (argued) Barbara A. Podell, Kohn, Savett, Marion & Graf. P.C., Philadelphia, Pa., for appellants.

Patrick T. Ryan (argued), Thomas J. Leach, Kathryn Steinbugler, Drinker, Biddle & Reath, Philadelphia, Pa., for appellees.

Before SEITZ, ADAMS and HAYNS-WORTH *, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal concerns the adequacy under federal securities law of disclosure in a tender offer by defendant Bass Brothers Enterprises, Inc. (Bass Brothers) for the outstanding shares of defendant National Alfalfa Dehydrating and Milling Company (National Alfalfa) and the propriety of subsequent merger under Delaware law.

Plaintiffs, former minority shareholders of National Alfalfa, charge in a class action that Bass Brothers and the management of National Alfalfa violated sections 10(b) and 14(e) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j, 78n(e) (1982), rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.-10b–5 (1983), as well as Delaware common law by failing to disclose material information in conjunction with the tender offer. At the conclusion of plaintiffs' case the district court directed a verdict for defendants. As to the federal claims, the judge ruled that plaintiffs had failed to produce sufficient evidence of fraudulent nondisclosure to raise a question of fact for the jury. Regarding the state claim, the judge found the subsequent merger had a proper business purpose. This appeal followed.

### I.

The essential facts of the case are undisputed. Bass Brothers is a closely held Texas corporation. At the time of the tender offer its principal business was oil exploration with subsidiary interests in hydrocarbon production, radio, television, ranching and cattle-raising. In 1974 Bass Brothers was approached by the president of Prochemco, Inc. (Prochemco), a Texas corporation engaged in ranching and cattle-feeding, as a possible source of financing for a purchase by Prochemco of a large block of National Alfalfa's stock. National Alfalfa, a Delaware corporation whose stock was traded on the American Stock Exchange, was engaged in farming, farm supply operations and the sale of animal feed. Its former president, Charles Peterson, was seeking to sell his controlling interest in the company in order to raise sufficient capital to repay a large personal debt. To present its proposal to Bass Brothers and other potential sources of funding, Prochemco prepared two reports on National Alfalfa's history and operations, including an appraisal of its assets based on alternative hypothetical valuations.

Although Bass Brothers declined to finance such a purchase by Prochemco, it indicated that it might consider proceeding as a principal should Prochemco fail to obtain the necessary funding. In late 1975 Prochemco informed Bass Brothers that it had been unable to obtain financing and that Peterson's block of National Alfalfa stock was still available. In return for providing the detailed information about National Alfalfa contained in the Prochemco reports and for assistance in analyzing National Alfalfa's current and potential performance, Bass Brothers agreed to pay Prochemco a $130,000 finders fee.

In December 1975 Bass Brothers entered into an option agreement for the purchase of Peterson's 52% share of National Alfalfa's outstanding common stock. Thereafter, Bass Brothers exercised its option and bought the approximately 1.3 million shares from Peterson for a price of $8.44 million or $6.47 per share. A short time

* Honorable Clement F. Haynsworth, Jr., United States Court of Appeals for the Fourth Circuit, sitting by designation.

later, in a private sale, Bass Brothers was able to acquire an additional 226,673 shares of National Alfalfa, representing 9.1% of the outstanding shares, at $6.45 per share. This acquisition increased Bass Brothers' holding to 61.2% of the outstanding shares of National Alfalfa.

On March 2, 1976, Bass Brothers made public its tender offer for "any and all" outstanding shares of National Alfalfa at $6.45 per share. The reports prepared by Prochemco for Bass Brothers were not appended to the tender offer, nor did the tender offer refer to Prochemco's appraisal of the overall values per share of National Alfalfa which stated that:

$6.40 could be realized through "liquidation [of National Alfalfa] under stress conditions";

$12.40 could be realized through "liquidation in an orderly fashion over a reasonable period of time";

$16.40 represented National Alfalfa's value "as [an] ongoing venture."

App. at 858a–59a.

The tender offer also did not refer to a second report prepared by Prochemco which gave two additional valuations: $17.28 representing the "Value per Peterson"; $7.60 representing the "Value per Prochemco." App. at 928a. To the contrary, the tender offer stated in bold letters that "Offeror did not receive any material non-public information from [National Alfalfa] with respect to its prior acquisitions of shares nor ... does it believe it presently possesses any such information. Offeror has not been able to verify independently the accuracy or completeness of the information contained in Appendices A through E [furnished by National Alfalfa] and assumes no responsibility therefor." App. at 617a.

On March 15, 1976, Bass Brothers did, however, issue a supplement to the tender offer describing the book value of "certain land owned or leased by" National Alfalfa and advising the shareholders that:

While the Offeror has made no independent appraisal of the value of the Company's land and makes no representation with respect thereto, in view of the foregoing factors the aggregate current fair market value of the Company's agricultural land may be substantially higher than its original cost as reflected on the books of the Company. Depending upon the respective market values for such land, stockholders could receive, upon liquidation of the Company, an amount per share significantly higher than the current book value and possibly higher than the price of $6.45 per Share offered by Offeror in the Offer. The amount received by stockholders upon liquidation of the Company would also be dependent upon, among other things, the market value of the Company's other assets and the length of time allowed for such liquidation. The Offeror has no reason to believe that the Company's management has any present intention of liquidating the Company. As noted on page 8 of the Offer to Purchase under "Purpose of This Offer: Present Relationship of Company and Offeror", Offeror does not currently intend to liquidate the Company.

The supplement also extended the duration of the offer by one week "to afford stockholders an opportunity to evaluate" the new information. While the offer was in effect, the named plaintiffs tendered their shares to Bass Brothers for $6.45 per share. At the expiration of the extended offer, Bass Brothers owned more than 92% of the outstanding shares of National Alfalfa and took control of the company by removing the board of directors and electing a new board of directors. Shortly thereafter, a Delaware "short-form merger" was effected between National Alfalfa and Bass Brothers Farming Company, a wholly owned subsidiary of Bass Brothers. Emerging as the surviving entity, National Alfalfa became a wholly owned subsidiary of Bass Brothers.

On June 21, 1976, a group of former shareholders of National Alfalfa filed this class action for damages in the district court charging that the information disclosed in the tender offer was insufficient under federal and state securities law.

Cross motions for summary judgment were denied. *Flynn v. Bass Brothers Enterprises, Inc.*, 456 F.Supp. 484 (E.D.Pa.1978). A jury trial commenced on September 13, 1983. On September 15, 1983, at the close of plaintiffs' case, defendants moved for a directed verdict. The district judge concluded that "the information that was provided by the tender offeror was not materially misleading in any way" particularly because "the information that was contained in the Prochemco report is the kind that is not permitted to be disclosed to shareholders because it is not based on sufficient information ... [T]he people who prepared it were interested in whatever transaction they were preparing it for at that time." With respect to the claim under Delaware law that the merger was improper because it was not in furtherance of a valid business purpose, the district court found that there was adequate "testimony that the merger was made necessary ... for an infusion of new capital ... into the National Alfalfa Company." App. at 587a. The district judge, determining that plaintiffs had not presented sufficient evidence under federal or state law to warrant sending the case to the jury, granted defendants' motion for a directed verdict.

## II.

■ A motion for a directed verdict under Fed.R.Civ.P. 50(a) enables the trial court to ascertain whether there is any question of fact for the jury and whether any verdict other than the one directed would be erroneous as a matter of law. *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2521 (1971). In reviewing a directed verdict, the appellate court is required to utilize the same standard as initially applied by the district court, *Maggipinto v. Reichman*, 607 F.2d 621, 624 n. 7 (3d Cir.1979), and to consider the evidence in the light most favorable to the nonmoving party. *See Continental Ore Co. v. Union Carbide & Carbon*

*Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

■ A directed verdict should not be granted for a defendant "if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability." *Dougherty v. Hooker Chemical*, 540 F.2d 174, 178 (3d Cir.1976). Further, a district court's grant of a directed verdict should be upheld if "without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict." *Brady v. Southern Railway Co.*, 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed.2d 239 (1943).

## III.

Plaintiffs allege that Bass Brothers and the management of National Alfalfa violated sections 10(b) and 14(e) of the 1934 Act and rule 10b–5 of the Securities and Exchange Commission (SEC) by not disclosing certain information with the tender offer. Specifically, plaintiffs maintain that defendants had a duty to disclose certain asset appraisal values because such information would have aided National Alfalfa's shareholders in deciding whether or not to accept Bass Brothers' tender offer. We must determine whether the district judge committed reversible error when he ruled that defendants had no duty to disclose the asset appraisal values they possessed.

■ In 1968, Congress enacted the Williams Act[1] as an amendment to the Securities and Exchange Act of 1934. The purpose of the Williams Act was to protect investors confronted by a tender offer for their stock. *See Piper v. Chris-Craft Industries*, 430 U.S. 1, 22–27, 97 S.Ct. 926, 939–942, 51 L.Ed.2d 124 (1977). Presenting the bill to the Senate, Senator Williams, it's sponsor, stated:

[t]his legislation will close a significant gap in investor protection under the Federal securities laws by requiring the disclosure of pertinent information to stockholders when persons seek to obtain con-

---

1. Pub.L. 90–439, 82 Stat. 454 (1968), *as amended*, Pub.L. 91–567, 84 Stat. 1497 (1970), codified at 15 U.S.C. §§ 78*l*(i), 78m(d)–(e), 78n(d) to (f) (1982).

trol of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities. 113 Cong.Rec. 854 (1967); *see also id.* at 24664.[2] Congress sought to ensure that public shareholders who are suddenly faced with a tender offer will not be forced to respond without adequate information regarding the qualifications and intentions of the offering party. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975). To that end, section 14(e) of the Williams Act prohibits the making of untrue statements of material fact or the omission of material facts in tender offers that could mislead the shareholders of a target company.[3] Similar in thrust to rule 10b–5,[4] this broadly worded anti-fraud provision protects target shareholders by subjecting tender offerors to advance disclosure requirements. *See Piper,* 430 U.S. at 22–27, 97 S.Ct. at 939–942.

■ Where a "duty to speak" exists, therefore, federal securities law requires the disclosure of any "material fact" in connection with the purchase or sale of a security under rule 10b–5 or the tendering of an offer under section 14(e). *See Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980); *see also Staffin v. Greenberg,* 672 F.2d 1196, 1202, 1205 (3d Cir.1982).[5] Bass Brothers does not deny that at the time of the tender offer it was under a duty to make certain disclosures in its capacity as a majority shareholder of National Alfalfa as well as in its capacity as a tender offeror. Similarly, the management of National Alfalfa does not deny that it owed a duty of disclosure to its shareholders. Our task, then, is to determine whether the alleged nondisclosures were material omissions, and thus breached the duty to disclose.

■ This Court has previously noted that section 14(e) of the Williams Act makes unlawful the failure to disclose any "material fact" in connection with a tender

---

**2.** Similarly, Manuel Cohen, the Chairman of the SEC when the Williams Act was enacted, testified to the Senate Subcommittee on Securities that "the general approach ... of [the Williams Act] is to provide the investor, the person who is required to make a decision, an opportunity to examine and to assess the relevant facts ...." Hearings on S. 510 before the Subcommittee on Securities of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 15 (1967).

**3.** Section 14(e) of the Williams Act provides, in part that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer....

15 U.S.C. § 78n(e) (1982).

**4.** Section 10(b) of the 1934 Act, 15 U.S.C. § 78j (1982), prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." Pursuant to this section, the SEC promulgated rule 10b–5 which provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud.

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1983).

**5.** Because we hold that at the time in question National Alfalfa had no duty to disclose the report prepared by Carl Schweitzer, a vice president of the company, we need not reach plaintiff's allegation that Bass Brothers, as the majority shareholder of National Alfalfa, had a duty to disclose the report. There is evidence in the record that Bass Brothers, although the majority shareholder of the target company, purposely distanced itself from the target management. App. at 323a. While not central to our decision in the present case, we note that a policy of conscious ignorance cannot eliminate the fiduciary duty a majority shareholder owes to the minority shareholders.

offer. *See Staffin,* 672 F.2d at 1205. Rule 10b–5 similarly prohibits such omissions with regard to the purchase or sale of a security. The Supreme Court defined materiality in the context of an alleged violation of rule 14a–9,[6] which governs disclosure requirements for proxy statements, in the following manner:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with [*Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 [90 S.Ct. 616, 24 L.Ed.2d 593] (1970)] general description of materiality as a requirement that "the defect have a significant *propensity* to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This definition of "material" has been adopted for cases involving rule 10b–5[7] and we see no reason not to utilize the same formulation for evaluating materiality in the context of a tender offer. *See Radol v. Thomas,* 556 F.Supp. 586, 593 & n. 15 (S.D.Ohio 1983) (employing the *Northway* formulation of materiality in section 14(e) and rule 10b–5 context); *see also Staffin,* 672 F.2d at 1205; *Panter v. Marshall Field & Co.,* 646 F.2d 271, 282 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

As a matter of public policy, the SEC and the courts generally have not required the inclusion of appraised asset valuations, projections, and other "soft" information in proxy materials or tender offers.[8] *See, e.g., South Coast Services Corp. v. Santa Ana Valley Irrigation Co.,* 669 F.2d 1265, 1271 (9th Cir.1982); *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1292–94 (2d Cir.1973); *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972); *Resource Exploration v. Yankee Oil and Gas,* 566 F.Supp. 54 (N.D.Ohio 1983); *Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532 (D.Del.1975); *Denison Mines Ltd. v. Fibreboard Corp.,* 388 F.Supp. 812 (D.Del.1974). The reasons underpinning the SEC's longstanding policy against disclosure of soft information stem from its concern about the reliability of appraisals, its fear that investors might give greater credence to the appraisals or projections than would be warranted, and the impracticability of the SEC's examining such appraisals on a case by case basis to determine whether they are sufficiently reliable to merit disclosure. *See Gerstle,* 478 F.2d at 1294; *see also* 17 C.F.R. § 240.14a–9 (note following rule 14a–9) (1976).

Although the disclosure of soft information has not been prohibited as a matter of

---

**6.** Rule 14a–9 states:

No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ...

17 C.F.R. § 240.14a–9(a) (1983).

**7.** *See, e.g., Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641, 647 (3d Cir.1980).

**8.** A minority shareholder of a target company who alleges a fraudulent misrepresentation or omission in connection with a cash tender offer, bears the burden of proving the materiality of the disputed information. *See Healey,* 616 F.2d at 648.

law,[9] this Court in the past has followed the "general rule" that "presentations of future earnings, appraised asset valuations and other hypothetical data" are to be discouraged. *Kohn*, 458 F.2d at 265. In failing to require disclosure, courts have relied on a perceived SEC policy favoring nondisclosure of soft information,[10] the lack of reliability of such information, and the reluctance to impose potentially huge liability for nondisclosure, even if desirable as a matter of public policy, because the law discouraged nondisclosure at the time of the alleged violation.[11]

In assessing the need to disclose an appraised asset valuation courts have considered several indicia of reliability: the qualifications of those who prepared or compiled the appraisal; the degree of certainty of the data on which it was based; the purpose for which it was prepared;[12] and evidence of reliance on the appraisal.[13]

*South Coast*, for example, involved a shareholders' challenge to the adequacy of disclosure in a proxy statement. The board of directors of SAVI received several offers to sell all of the company's assets for cash. During negotiations, the SAVI board hired an expert appraiser to value two of SAVI's properties; the board prepared internal valuations for the remainder of the company's property. *South Coast*, 669 F.2d at 1267–69. In its proxy statement issued with the intent to elicit shareholder approval of a sale of SAVI's assets, the board revealed the expert's valuations with an appropriate disclaimer. The internal valuations for the remaining properties were not revealed, however. A divided panel of the Ninth Circuit[14] held that the trial judge did not commit reversible error in determining that SAVI had no duty to disclose its internal appraisals. The court reasoned that none of the directors were expert appraisers and that no satisfactory basis upon which the estimates were made had been established. *Id.* at 1272.

At the time Bass Brothers was making its tender offer, although courts did not generally require the disclosure of asset valuations, such disclosure was not prohibited. In *Alaska Interstate*, the acquiring company, over the objection of the target management, included, with proper cautionary remarks, a range of hypothetic liquidation values made by the target management. The court approved the release of the valuations in spite of the "general rule" discouraging such disclosure which this Court announced in *Kohn*. *Alaska Interstate*, 402 F.Supp. at 572.

Recently, there have been indications that the law, in response to developing corporate trends, such as the increase in mergers, has begun to favor more disclosure of soft information. In this regard, we note that SEC policy—a primary reason courts in the past have not required the disclosure of soft information—has begun to change. With respect to disclosure of projections of future earnings, the SEC in 1976 deleted future earnings from the list

9. *See, e.g., Radol v. Thomas*, 556 F.Supp. 586 (N.D.Ohio 1983); *Alaska Interstate Co. v. McMillan*, 402 F.Supp. 532 (D.Del.1975); *Denison Mines v. Fibreboard Corp.*, 388 F.Supp. 812 (D.Del.1974).

10. *See, e.g., South Coast*, 669 F.2d at 1271; *Gerstle*, 478 F.2d at 1292–94; *Kohn*, 458 F.2d at 265.

11. *See, e.g., South Coast*, 669 F.2d at 1271–72; *Panter*, 646 F.2d at 292–93; *Gerstle*, 478 F.2d at 1292–94; *Kohn*, 458 F.2d at 265.

12. *See, e.g., Panter*, 646 F.2d at 293 (no need to disclose "tentative estimates prepared for the enlightenment of management with no expectation that they be made public"); Kohn, 458 F.2d at 265 (not required to disclose appraisals which were "advanced by parties during negotiation only and as part of their bargaining strategies"); *Radol*, 556 F.Supp. at 558 (reports "intended to be 'selling documents' for use in attracting more favorable tender offer" are less reliable); *Alaska Interstate*, 402 F.Supp. at 567–68, 571.

13. For examples of courts employing these considerations, see *South Coast*, 669 F.2d at 1272; *James v. Gerber Prods. Co.*, 587 F.2d 324, 327 (6th Cir.1978); *Gerstle*, 478 F.2d at 1292–94; *Kohn*, 458 F.2d at 1265; *Radol*, 556 F.Supp. at 594; *Alaska Interstate*, 402 F.Supp. at 571.

14. The dissent argued that the board's valuation was sufficiently reliable to require disclosure. *South Coast*, 669 F.2d at 1275–76 (Fletcher, J., dissenting).

of examples of potentially misleading disclosures in the note which follows rule 14a–9.[15]

More importantly, in 1978 the SEC issued a safe harbor rule for "forward-looking" statements, such as future earnings, made in good faith. 17 C.F.R. § 230.175 (1983). And with respect to asset valuations, the SEC in 1980 authorized disclosure of good faith appraisals made on a reasonable basis in proxy contests in which a principal issue is the liquidation of all or a portion of a target company's assets. *See* SEC Release No. 34–16833, Fed.Sec.L.Rep. (CCH) ¶ 24,-117 (May 23, 1980), codified at 17 C.F.R. § 241.16833 (1983). While SEC policy has not yet explicitly approved the disclosure of appraisal values when the target is to continue as a going concern rather than being liquidated, recent SEC promulgations herald a new view, more favorably disposed towards disclosure.

Part of the reason for this shift in policy is recognition of shareholders' need for such information.[16] One rationale for the initial prohibition of soft information was the fear that potential *purchasers* of securities would be misled by overly optimistic claims by management. *See Gerstle*, 428 F.2d at 1294. An unintended by-product of such concern, however, was to keep valuable information from those shareholders who had to decide, within the context of a tender offer or merger, whether or not to *sell* their securities. *See* Kripke, *Rule 10b–5 Liability and "Material Facts,"* 46 N.Y.U.L.Rev. 1061, 1071 (1971). The present spate of proxy contests and tender offers was not anticipated when the SEC initially formulated its policy of nondisclosure of soft information.

At least one court has recognized that disclosure of asset valuations may be required. In *Radol*, plaintiffs challenged, among other things, the adequacy of disclosure in United States Steel's successful tender offer for Marathon Oil Company's stock in 1981. Rejecting the notion that "asset valuations are, as a matter of law, not material," the court held that such a determination was a matter for the jury to resolve in light of all the circumstances. *Radol*, 556 F.Supp. at 594; *see also Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

The time lag between when a challenged tender offer or proxy statement is issued and when a trial or appellate court finally renders a decision on its sufficiency often can be considerable. This time lag has caused an unexpected side effect: it has retarded the evolution of the law concerning disclosure. For example, the Second Circuit decided *Gerstle* in 1973, yet the challenged proxy statement had been issued in 1963.

In *Gerstle*, the SEC filed an amicus brief which set forth the view that notwithstanding the Commission's longstanding position that "in financial statements filed with the Commission, fixed assets should be carried at historical cost (less any depreciation)" and that "appraisals generally cannot be disclosed because they may be misleading," existing appraisals of current liquidating value must be disclosed if they have been made by a qualified expert and have a sufficient basis in fact. *Gerstle*, 478 F.2d at 1291, 1292. The Second Circuit stated, however, that in 1963 it had "long been an article of faith among lawyers specializing in the securities field that appraisals of assets could not be included in a proxy statement." *Id.* at 1293. The court also added that "[h]owever desirable such a policy may be, we do not believe this is what it was in 1963." *Id.* Holding that defendant Skogmo was not liable for its failure to disclose appraisals of the current market value of the merged company's plants which remained unsold at the time of the merger, the court candidly admitted that it "would be loath to impose a huge liability

---

15. *See* Securities Act Release No. 5699, Notice of Adoption of an Amendment to Rule 14a–9, etc., [1975–1976 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 80,461 (1976).

16. *See generally* Brudney, *Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws,* 93 Harv.L.Rev. 322 (1979).

on Skogmo" because the law had evolved in the interim. *Id.* at 1294.

The Second Circuit's holding in 1973, admittedly influenced by the ten year time lapse between the proxy statement and the culmination of the litigation, became one basis for the Ninth Circuit's decision in *South Coast* in 1982. Once again, a court deciding a case a substantial time after the challenged acts felt compelled not to give full weight to changes in SEC policy and scholarly debate on disclosure. *See South Coast,* 669 F.2d at 1271–73.

 In order to give full effect to the evolution in the law of disclosure, and to avoid in the future, at least in the Third Circuit, the problem caused by the time lag between challenged acts and judicial resolution, today we set forth the law for disclosure of soft information as it is to be applied from this date on. Henceforth, the law is not that asset appraisals are, as a matter of law, immaterial. Rather, in appropriate cases, such information must be disclosed. Courts should ascertain the duty to disclose asset valuations and other soft information on a case by case basis, by weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note.[17]

The factors a court must consider in making such a determination are: the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information. *Cf. Alaska Interstate Co.,* 402 F.Supp. at 567.[18]

## IV.

 It is against the background set forth in Part III, *supra,* that we must determine whether the trial judge erred in ruling that Bass Brothers and the management of National Alfalfa had no duty to disclose the asset valuations at issue in this case. We note that despite our formulation of the current law applicable to corporate disclosure, we are constrained by the significant development in disclosure law since 1976 not to apply the announced standard retroactively,[19] but to evaluate defendants' conduct by the standards which prevailed in 1976.

Plaintiffs point to three sources of information that they believe should have been disclosed in the tender offer; the Prochemco reports; a report allegedly commissioned by Bass Brothers to corroborate the appraisals in the Prochemco reports; and an internal valuation prepared by National Alfalfa's accountant and vice-president, Carl Schweitzer.

### A.

 The shareholders contend that the Prochemco reports were material and should have been disclosed. However, employing the approach commonly followed by courts when Bass Brothers made its tender offer in early 1976, we do not find the Prochemco reports had sufficient indicia of reliability to require disclosure. Plaintiffs did not adequately establish that the reports were prepared by experts. Although Prochemco did have experience in acquisitions, there was scant evidence of

---

**17.** Some courts have approved the release of appraisal values with an appropriate disclaimer. *See, e.g., South Coast,* 669 F.2d at 1269; *Alaska Interstate,* 402 F.Supp. at 573.

**18.** For the SEC's views, as of 1980, on factors to be considered when releasing appraisal valuations, see SEC Release No. 34–16833. Interpretive Release Relating to Proxy Rules, Fed.Sec.L. Rep. (CCH) ¶ 24.117 (May 23, 1980).

**19.** Our reluctance to apply the new standard for disclosure retroactively is confined to the facts of this case. We do not intend to imply that in other cases based on actions occurring before the date of this opinion, the new standard necessarily is inapplicable.

the company's expertise in appraising the type of land involved in the present case. Moreover, plaintiffs did not establish that the reports had sufficient basis in fact to be reliable. Evidence introduced at trial demonstrated only that the first Prochemco report was based on a report prepared by one of the company's employees, but no basis for the reliability of this foundation report was established. The first Prochemco report itself merely stated that it "is our opinion, based on an evaluation by our staff as well as local interviews with those knowledgeable in farm real estate and with the Soil Conservation Service." App. at 843a. No basis was established for the second report.

The purpose for which the Prochemco reports were prepared—to attract financing for its proposed purchase of Peterson's controlling block of National Alfalfa shares—also diminishes the reliability of the reports. Further, at the time of the tender offer the valuations in the Prochemco reports were outdated.

Plaintiffs assert that the reliability of the reports was amply demonstrated by Bass Brothers' reliance on them and by the payment of $130,000 to Prochemco for them. The shareholders reason that "if the Prochemco reports were reliable and accurate enough for Bass Brothers to use ... in deciding to [purchase Peterson's stock] then the existence of and valuations in the Prochemco reports were material and should have been shared with National Alfalfa's shareholders" through the tender offer. To bolster their argument, the shareholders note that after buying Peterson's stock, Bass Brothers chose not to examine any of National Alfalfa's internal asset valuations before making the tender offer.

Although it is not inconceivable that Bass Brothers may have relied on the Prochemco valuations, plaintiffs did not advance sufficient evidence to establish the point. Moreover, even if there had been some reliance on the reports, that alone would be insufficient to mandate disclosure in this case. The reports were not prepar-ed by experts, had no adequately demonstrated basis in fact and were prepared to encourage financing to purchase Peterson's share. In light of the record before us, we cannot say that the district court erred in concluding that at the time of the tender offer Bass Brothers had no duty to disclose the Prochemco reports.

### B.

 Plaintiffs assert that Bass Brothers also should have disclosed its own internal valuations. To substantiate their belief that Bass Brothers commissioned a report to corroborate the information in the Prochemco report, the shareholders point to an informal typewritten list of "Items for Investigation" drawn up by Rusty Rose, a Bass Brothers consultant. The list sets forth a number of assignments to be performed by Rose. Item 2(a) states: "Have expert appraise farm land and equipment." A handwritten notation after this item states "Done—values confirmed." At trial it was revealed that Richard Rainwater, a Bass Brothers officer, had written the notation, although no evidence was produced concerning the circumstances under which the notation was made. The shareholders contend that this cryptic notation, without more, "confirms that Bass Brothers had obtained an 'expert' appraisal." Plaintiffs had ample opportunity during discovery to pursue this lead yet failed to turn up any additional evidence of a corroborating study. Presentation of this handwritten notation, alone, to the jury simply could not support a finding of fraudulent and material nondisclosure of information.

### C.

 The third piece of information that the shareholders claim should have been disclosed was a study prepared by Carl Schweitzer, a vice president of National Alfalfa, using various assumptions, such as the projected appreciation of National Alfalfa's land holdings, to arrive at a value per share of $12.95. At trial, Schweitzer's unrefuted testimony indicated that such a

figure was, in fact, hypothetical because of the nature of the assumptions used in the calculation. Schweitzer stated that he used land values supplied by Peterson and some "unnamed people within or without of the company." App. at 445a. Thus, plaintiffs have not established a sufficient factual basis for the valuations. Moreover, the purpose of some of these calculations was to help Peterson find a buyer for his stock. Schweitzer testified that the land values were inflated, or optimistic, so as to present the company in the best possible light to future investors. App. at 446a. Moreover, Schweitzer admitted that neither he nor members of National Alfalfa's accounting staff had expertise with regard to land appraisal. App. at 471a–73a. Thus, plaintiffs were unable to produce evidence that the Schweitzer reports were sufficiently reliable to be material for shareholders confronted with the tender offer.

## V.

We also conclude that the district court did not err when it ruled that the other alleged deficiencies in the tender offer were not material. At the time Bass Brothers bought Peterson's controlling interest in National Alfalfa, the target company had reported operating losses for two of the five years preceding the sale. In 1975, the last year reported, National Alfalfa showed a negligible profit. Bass Brothers explicitly stated, in an amendment to the Schedule 13D form filed with the SEC in January 1976, that once it had acquired control of National Alfalfa by Peterson's stock, it intended to make a tender offer for all remaining outstanding shares for the purpose of effecting a merger. Upon completion of the merger, National Alfalfa would become a wholly owned subsidiary of Bass Brothers.

Furthermore, the actual market value of National Alfalfa's stock for the period immediately preceding the tender offer could be readily ascertained by referring to its recent trading record on the American Stock Exchange. In the tender offer, Bass Brothers quoted actual prices for National Alfalfa shares for the period 1973–76 and noted that "the high and low sales prices from February 11—March 1, 1976 were 6½ and 6⅛ respectively." The tender offer also called the shareholders' attention to Appendix E which "contain[ed] important information with respect to [National Alfalfa's] belief that the aggregate current fair market value of its agricultural land may be substantially higher than its original cost as reflected on the books..."[20] In paragraph 9 of the tender offer Bass Brothers referred to the lawsuit instituted by National Alfalfa against Peterson (Peterson Litigation) and stated, "[i]n connection with the purchase of [Peterson's] shares, Offeror agreed to reimburse Mr. Peterson for that portion of any amount of cash actually paid by Mr. Peterson." Paragraph 12 discussed the nature of the Peterson Litigation.[21]

The tender offer and supplementary material fully disclosed Bass Brothers' controlling interest in the company, the price Bass Brothers paid to acquire the controlling interest, Bass Brothers' desire to effect a merger, and the Peterson Litigation. Although the tender offer did not fully disclose the valuation of National Alfalfa's land holdings, plaintiffs did not demonstrate that the asset valuations were suffi-

---

**20.** Appendix E was later repudiated by the management of National Alfalfa because shareholders might have erroneously inferred that the Board of Directors approved the tender offer. The information contained in Appendix E, however, was considered reliable by Bass Brothers and was republished as Supplement I to the tender offer on March 15, 1976. Both Appendix

E and Supplement I described the values of land held by National Alfalfa.

**21.** In early 1974 Peterson was discharged by National Alfalfa's Board of Directors from his position as President and Chief Executive Officer for allegedly engaging in unauthorized trading of cattle futures contracts causing the company to incur substantial losses. National Alfal-

ciently reliable, as judged by 1976 standards,[22] to require their disclosure.[23]

## VI.

Finally, plaintiffs assert that Bass Brothers' merger of National Alfalfa with Bass Brothers Farming Company, a wholly owned subsidiary of Bass Brothers, had no proper business purpose and therefore violated Delaware law. *In Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del.1983), the Supreme Court of Delaware eliminated the proper business purpose requirement for mergers. The court stated that "such requirement shall no longer be of any force or effect." *Id.* at 715. The rejection of the proper business purpose requirement was accompanied by the adoption of a liberalized appraisal remedy. The court explicitly made the new appraisal remedy prospective, for cases arising after February 1, 1983. It is not clear, however, if the rejection of the valid business purpose requirement is also only prospective, particularly since the court granted its liberalized appraisal remedy to shareholders in "any case challenging a cash-out merger, the effective date of which is on or before February 1, 1983." *Id.* at 714. However, we need not decide whether *Weinberger* applies to the present case.

Under Delaware law prior to *Weinberger*, a merger "made for the sole purpose of eliminating a minority on a cash-out basis" was improper. *Singer v. Magnavox Co.*, 380 A.2d 969, 978 (Del.1977), *overruled by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983). Nevertheless, a merger with almost any purpose in addition to the freeze out was valid. For example, in *Tanzer v. International General Industries, Inc.*, 379 A.2d 1121 (Del.1977), *overruled by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), a majority shareholder

effected a merger to freeze out the minority. The sole purpose of the merger was to benefit the parent corporation, by facilitating its long term debt financing. *Id.* at 1124. The court accepted the chancellor's ruling that because the parent had a legitimate reason to be the sole shareholder of the new company, the parent "is not freezing out the minority just for the purpose of freezing out the minority." *Id.*

Sid Bass, president and chairman of the board of Bass Brothers during the crucial period, gave testimony, unrefuted by plaintiffs, that Bass Brothers determined that National Alfalfa's "health, fiscal health, would be vastly improved if additional capital were injected into the company." App. at 388a. Bass further stated that Bass Brothers was unwilling to inject a substantial amount of capital if such contribution would be diluted by minority interests. App. at 391a. Subsequent to the Delaware short-form merger, Bass Brothers did, in fact, inject $21,000,-000 into the new National Alfalfa. App. at 425a. We hold that the trial judge's ruling that such a purpose was proper under Delaware law was not in error.

## VII.

After carefully examining the evidence presented by the shareholders in the light most favorable to them, we are persuaded that the district court's grant of a directed verdict for defendants was not error; therefore it will be affirmed.

---

fa filed suit against Peterson for $2.1 million in damages.

**22.** Were this case tried under the standard for disclosure we announce today, the case might well have been for the jury.

**23.** We hold only that the appraisals available to defendants did not need to be disclosed at the

time in question. Plaintiffs did not raise, and we do not reach, the issue whether at the time of the tender offer there was an *affirmative* duty on defendant Bass Brothers, either as tender offeror or as majority shareholder, or on the target management to provide such information to the target's shareholders.