**SHAMROCK HOLDINGS, INC., a Delaware corporation, Shamrock Holdings of California, Inc., a California corporation, Shamrock Capital Investors III, Inc., a Delaware corporation, Emerald Isle Associates, L.P., a Delaware limited partnership, and Shamrock Acquisition III, Inc., a Delaware corporation, Plaintiffs,**

v.

**POLAROID CORPORATION, a Delaware corporation, Defendant.**

Civ. A. No. 89–93–CMW.

United States District Court, D. Delaware.

March 20, 1989.

from proceeding.

A. Gilchrist Sparks, III and Lawrence A. Hamermesh of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel), for plaintiffs.

R. Franklin Balotti, Jesse Finkelstein, C. Stephen Bigler and Anne C. Foster of Richards, Layton & Finger, Wilmington, Del. (John R. Hupper, Robert S. Rifkind and Stuart W. Gold of Cravath, Swaine & Moore, New York City, of counsel), for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

Plaintiffs Shamrock Holdings, Inc., Shamrock Holdings of California, Inc., Shamrock Capital Investors III, Inc., Emerald Isle Associates, L.P. and Shamrock Acquisition III, Inc. (collectively "Shamrock") brought this action for injunctive relief on March 1, 1989, against defendant Polaroid Corporation ("Polaroid").[1] This action is the latest eddy in what has become a maelstrom of litigation surrounding Shamrock's unwelcome effort to acquire Polaroid.

Shamrock seeks preliminary and permanent injunctive relief against the cash self-tender offer for up to 16 million shares of Polaroid common stock commenced February 21, 1989, ("Offer") by defendant Polaroid. The Offer is scheduled to expire March 20, 1989, unless extended. Shamrock contends the Offer is violative of Sections 13(e), 14(a) and 14(e) of the Securities

---

1. Plaintiff Shamrock Holdings, Inc. ("Shamrock Inc.") is a Delaware holding company that operates through a number of subsidiaries. Plaintiff Shamrock Holdings of California, Inc. ("Holdings") is a California corporation and a wholly owned subsidiary of Shamrock Inc. Plaintiff Emerald Isle Associates, L.P. ("Emerald Isle") is a Delaware limited partnership. Plaintiff Shamrock Capital Investors III, Inc., a Delaware corporation, is the general partner in Emerald and is itself a wholly owned subsidiary of Holdings. Plaintiff Shamrock Acquisition III, Inc. is a Delaware corporation and a wholly owned subsidiary of Emerald.

As of March 1, 1989, the plaintiffs beneficially owned in excess of 4.9 million shares of Polaroid common stock, representing approximately 6.9% of Polaroid's common stock outstanding, including the approximately 9.7 million shares issued to the Polaroid Employee Stock Ownership Plan ("ESOP"), the validity of which is currently the subject of legal dispute.

Defendant Polaroid Corporation is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78m(e), 78n(a) and 78n(e), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission ("SEC"). Shamrock seeks corrective disclosure and pre-clearance of certain materials with the SEC. The Court has jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331, 2201 and 2202. This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law as required by F.R.C.P. 52(a).

## I. BACKGROUND

### A. *Facts and Procedural History*

Much of the background of the protracted litigation between Polaroid and Shamrock has been presented elsewhere, *see Polaroid Corp. v. Disney*, 698 F.Supp. 1169, 1171–73 (D.Del.1988), *aff'd in part and vacated in part*, 862 F.2d 987, 990–91 (3d Cir.1988), and thus will not be repeated here except as relevant. On September 9, 1988, Shamrock commenced a $2.6 billion hostile tender offer for all outstanding common shares of Polaroid at $42 per share, excluding shares held through Polaroid's Employee Stock Ownership Plan ("ESOP"), the validity of which Shamrock is challenging in separate litigation in the Delaware state courts.[2] Polaroid filed suit in this Court on September 20, 1988, against Shamrock and several individual defendants. It sought an injunction against Shamrock's offer based, *inter alia*, on several alleged violations of the securities laws.

On October 14, 1988, this Court denied Polaroid's motion for a preliminary injunction. *See Polaroid Corp. v. Disney*, 698 F.Supp. 1169 (D.Del.1988). On November 23, 1988, the United States Court of Appeals for the Third Circuit reversed the District Court's refusal to grant Polaroid's motion for a preliminary injunction and remanded the case to the District Court. *See Polaroid Corp. v. Disney*, 862 F.2d 987 (3d Cir.1988). The District Court preliminarily

enjoined the Shamrock offer on November 29, 1988. Following distribution by Shamrock of supplemental disclosure and a press release pursuant to Court order, the Court vacated the injunction by order dated December 14, 1988.

On January 19, 1989, Shamrock amended its tender offer to increase its offer price to $45 per share, including the ESOP shares. Like its initial offer, Shamrock's revised offer is subject to a number of terms and conditions, which are set forth in the Second Supplement to Shamrock's Offer to Purchase ("Revised Offer"). Shamrock indicated that it intends to extend the Revised Offer from time to time until the earlier of (a) a final judicial determination of whether the ESOP shares were validly issued or (b) the 1989 annual meeting of Polaroid shareholders, now scheduled for May 9. If there is a final judicial determination that the ESOP shares were not validly issued, Shamrock has stated that it intends to amend its offer to increase the price to be paid to $47 per share for 100% of Polaroid's then outstanding shares, which would presumably exclude the ESOP shares. On March 15, 1989, Shamrock extended its offer until May 15, 1989.

In conjunction with the Revised Offer, Shamrock announced that, if the offer is not consummated prior to the scheduled May 9, 1989, annual meeting of Polaroid shareholders, Shamrock intends to seek the election at the meeting of a slate of directors who will be committed to the sale of Polaroid. Shamrock further disclosed that it anticipates that, following their election, the new directors will effectuate the sale of Polaroid to Shamrock pursuant to the Revised Offer unless a bona fide third-party offer is made for all outstanding Polaroid shares at a higher price and on other terms and conditions that are no less favorable to Polaroid shareholders. In the latter event, the new directors will facilitate the sale of Polaroid pursuant to such other offer.

---

2. *See Shamrock Holdings, Inc. v. Polaroid Corp.*, No. 10,075, No. 10,079, 1989 WL 1156 (Del.Ch. Jan. 6, 1989). Vice Chancellor Berger's decision upheld the validity of the Polaroid ESOP under Delaware law.

On February 3, 1989, Schedule 14B filings were made on behalf of persons required to make such filings under SEC Rule 14a–11(c)(1), 17 C.F.R. § 240.14a–11(c)(1). That same day, Shamrock also announced its slate of 14 nominees for election as new directors. On February 12, 1989, Schedule 14B filings were made by Polaroid.

On January 24, 1989, Polaroid announced that its board had met and determined to reject Shamrock's Revised Offer and to recommend to stockholders that they not tender to Shamrock. Polaroid stated that among the factors that the board considered in deciding to reject the Revised Offer was that "until the ultimate amount of the recovery in the Kodak litigation is finally adjudicated, such recovery is likely to be undervalued by third parties as a result of uncertainty and their own lack of knowledge of the full merits of the Company's claim." [3] Offer at 10. Polaroid further stated that its board had relied on the opinion of Polaroid's investment banker, Shearson Lehman Hutton, Inc. ("Shearson"), that the Revised Offer was "inadequate from a financial point of view." *Id.*

On January 30, 1989, Polaroid announced a "recapitalization", which included a preferred stock issuance and a share repurchase program. The preferred stock issuance is part of the financing for the repurchase program. Offer at 4. That same day, Polaroid, in exchange for an aggregate purchase price of $300 million, issued $300 million in convertible preferred shares to an investor group led by Corporate Partners, L.P. ("Corporate Partners"),

a Delaware limited partnership organized by the investment banking firm of Lazard, Freres & Co. The shares pay dividends of 11% to 11.5%. The preferred stock is convertible into common stock at $50 per share, thus amounting to six million new Polaroid shares. Corporate Partners also received the right, for seven years, to convert 635,000 warrants for an equal amount of common stock, also at $50 apiece, thus raising its potential total holdings of Polaroid common stock to at least 6.6 million shares. Additionally, the agreement provided that Corporate Partners and its fellow investors may designate two new Polaroid directors, thus increasing the size of the board from its current 12 members to 14.

As the second part of its recapitalization plan, Polaroid announced its intention to repurchase $1.125 billion of its outstanding shares.[4] As is set forth in Polaroid's Offer of February 21, 1989, $800 million (16 million shares at $50 per share) of those shares are to be repurchased by means of the self-tender offer, scheduled to expire March 20, 1989, unless extended. The Offer states that, after the consummation of the self-tender offer, Polaroid intends to purchase the remaining $325 million of shares "in the open market, in privately negotiated transactions or otherwise." ("Selective Buyback") Offer at 4.[5]

The Offer is not conditioned on any minimum number of shares being tendered. Offer at 1. If more than 16 million shares are validly tendered, Polaroid will accept shares for payment on a pro rata basis. *Id.* at 3.

---

**3.** In April 1976, Polaroid brought suit against Kodak Corporation in federal court in Massachusetts charging that Kodak had infringed several patents held by Polaroid. On October 11, 1985, the court entered judgment in Polaroid's favor with respect to certain of the patents. All appeals by Kodak as to liability have been exhausted. The trial on the issue of damages is scheduled to begin April 17, 1989.

**4.** As of February 16, 1989, there existed 71,534,-361 shares of Polaroid common stock outstanding, including the 9,616,011 shares held by Polaroid's ESOP. The 16 million shares that Polaroid is offering to purchase pursuant to the Offer represented approximately 22% of the to-

tal number of outstanding shares as of February 16, 1989. The number of shares held by the ESOP as of that date represented approximately 13.4% of the outstanding shares. Offer at 3.

**5.** The timing and terms of these purchases have not yet been determined, and the Offer states that they:

> will depend on many factors, including the market price of the Shares, the results of the Offer and the Company's business and financial condition. Accordingly, there can be no assurance as to the timing or terms of any such additional purchases.

Offer at 4.

## B. *Related Litigation*

On January 30, 1989, Shamrock · commenced a lawsuit in the Delaware Chancery Court seeking, *inter alia,* to enjoin Polaroid's preferred stock issuance and the stock repurchase program. *See* Complaint in *Shamrock Holdings, Inc. v. Polaroid Corp.,* No. 10582, 1989 WL 7033 (Del.Ch. filed Jan. 30, 1989). The focus of that dispute is whether Polaroid and its directors have fulfilled their fiduciary duties under Delaware law in making the self-tender and in issuing the preferred stock. The amended complaint in that action seeks, *inter alia,* recision of the issuance of the preferred stock. Vice Chancellor Berger heard oral argument on Shamrock's request for a preliminary injunction on February 27, 1989.

On March 6, 1989, the Delaware Supreme Court, which was considering an appeal of Vice Chancellor Berger's January 6, 1989, decision upholding the validity of the Polaroid ESOP, ordered that the dispute concerning the validity of the ESOP be considered in conjunction with Shamrock's challenge to the Polaroid recapitalization plan. *In re Polaroid Shareholders Litig.,* Del.Supr., No. 13, 1989, Horsey, J. (March 6, 1989) (Order).

On March 17, 1989, Vice Chancellor Berger issued an Opinion that constituted a decision on the plaintiffs' motions for a preliminary injunction in the second-filed litigation, as well as a decision on remand in the ESOP action.[6] *Shamrock Holdings, Inc. v. Polaroid Corp.,* No. 10,075; No. 10,079; No. 10,582; No. 10,585, 1989 WL 24396 (Del.Ch. March 17, 1989). In that Opinion, the Vice Chancellor stated that she was "unable to find, on the present record, that the primary purpose of the Management Transactions [stock repurchase and preferred stock issuance] was to interfere with a stockholder vote." *Id.,* slip op. at 19.

In denying plaintiffs' motions for a preliminary injunction, Vice Chancellor Berger concluded that:

In sum, although I am not entirely satisfied that the issuance of the Preferred Stock was simply a financing device, I am unable to conclude preliminarily that either the Corporate Partners transaction alone or the Management Transactions as a whole are unreasonable either because they are disproportionate to the Shamrock threat or because they were improperly motivated.

*Id.,* slip op. at 36. Additionally, the Opinion found that no new conclusions of law were necessary or appropriate in the ESOP decision. *Id.,* slip op. at 37.

## C. *Preliminary Injunction Standard*

To succeed on a motion for a preliminary injunction in the Third Circuit, the moving party must establish:

(1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... [W]hile the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*Eli Lilly & Co. v. Premo Pharm. Labs,* 630 F.2d 120, 136 (3d Cir.1980) (quoting *Constructors Ass'n of Western Penna. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978)), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

## II. ISSUES

Through the welter of assertions contained in Shamrock's brief and with the aid of Polaroid's summary of argument, the Court can glean seven major issues:

(1) Whether Polaroid fully and fairly disclosed the material facts regarding the Kodak litigation;

(2) whether Polaroid's projections of future financial performance are materially omissive and misleading;

---

**6.** This Court received a copy of Vice Chancellor Berger's Opinion on March 17, 1989, after the present Opinion was written. Information re-garding the Chancery Court Opinion is included here to bring the facts up to date.

(3) whether disclosure of the "blended value" of the self-tender is required;

(4) whether Polaroid fully and fairly disclosed the purpose of the repurchase plan;

(5) whether Polaroid's disclosure regarding Corporate Partners was sufficient;

(6) whether Polaroid adequately disclosed its intention as to a further defensive transaction; and

(7) whether Polaroid's Offer is a proxy solicitation.

## III. ANALYSIS

Shamrock contends that Polaroid's Offer violates Sections 13(e), 14(a) and 14(e) of the Exchange Act and the rules and regulations promulgated thereunder.[7] Section 13(e) of the Exchange Act makes it unlawful for an issuer to purchase its own securities without complying with SEC regulations designed to prevent fraudulent, deceptive or manipulative acts. Pursuant to that section, the SEC promulgated Rule 13e–4(b)(1), which provides that:

It shall be a fraudulent, deceptive or manipulative act or practice, in connection with an issuer tender offer, for an issuer or an affiliate of such issuer, in connection with an issuer tender offer:

(i) to employ any device, scheme or artifice to defraud any person;

(ii) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(iii) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

SEC Rule 13e–4(b)(1), 17 C.F.R. § 240.13e–4(b)(1).

Pursuant to SEC Rule 13e–4(d), 17 C.F.R. § 240.13e–4(d), an issuer which is making a self-tender offer must disseminate to all of its shareholders an offer to purchase containing the information required by Items 1 through 8 of SEC Schedule 13E–4, 17 C.F.R. § 240.13E–101. Such information includes, *inter alia*, the source of the funds for the offer, the purpose of the offer, certain financial data and any plans or proposals of the issuer that relate to or would result in the acquisition or disposition of any securities of the issuer and any material change in the issuer's corporate structure or business.

Section 14(e) of the Exchange Act provides, in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation.

15 U.S.C. § 78n(e).

A material fact is one that would have assumed actual significance in the deliberations of a reasonable shareholder in deciding whether to tender his or her shares. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would

---

**7.** There exists the threshold issue of whether Shamrock has standing to seek injunctive relief based on such claims. Polaroid argues that Shamrock's assertion of irreparable harm is based solely on behalf of shareholders other than Shamrock. In other words, Polaroid contends that injunctive relief is unwarranted because Shamrock asserts no claim of harm to itself. Polaroid grounds this argument on its assumption that Shamrock has already decided not to tender into the self-tender and therefore has no investment decision to make.

The Court is unwilling to make such a broad assumption concerning whether Shamrock will tender its shares back to Polaroid. Shamrock is presently a major Polaroid stockholder, and it has a right, like any other shareholder, to tender its shares into the self-tender. In making the decision whether to tender, Shamrock is entitled to material information. Shamrock thus has standing to seek injunctive relief against allegedly misleading and omissive statements of Polaroid.

have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

### A. *Kodak Litigation*

■ Polaroid has stated that the judgment of liability for patent infringement against Kodak is the "single most important asset of the Polaroid Corporation." Mem. in Opposition to Plaintiffs' Motion to Compel in *Shamrock Holdings, Inc. v. Polaroid Corp.*, No. 10582 (Del.Ch. filed Jan. 30, 1989). As Vice Chancellor Berger noted in her opinion upholding the Polaroid ESOP, "Polaroid has a potentially enormous, as yet unliquidated asset—damages from Kodak for patent infringement (Polaroid is seeking more than $6 billion)." *Shamrock Holdings, Inc. v. Polaroid Corp.*, No. 10,075, No. 10,079 (Del.Ch. Jan. 6, 1989) at 6. Polaroid, of course, is pursuing the maximum recovery possible. Offer at 22. Kodak has vigorously resisted all of Polaroid's claims and has publicly stated that Polaroid should not recover more than $200 million (before interest). *Id.* at 21.

The potentially huge Polaroid judgment against Kodak has both contributed to Polaroid's attractiveness as a takeover target and has been a factor in Polaroid's rejection of takeover proposals. As one of the reasons given for Polaroid's rejection of Shamrock's overtures, Polaroid has stated that, "until the ultimate amount of the recovery in the Kodak Litigation is finally adjudicated, such recovery is likely to be undervalued by third parties as a result of uncertainty and their own lack of knowledge of the full merits of the Company's claim." [8] Offer at 10, 22.

Polaroid's disclosures concerning the Kodak litigation consist of five pages of text and four tables in its Offer. Offer at 19–25. The Offer summarizes the history of the litigation and the basic positions set forth by Polaroid and Kodak. It states Polaroid's commitment to "explore means of using the recovery, when realized, to enhance short-term value to the Company's stockholders." Offer at 22. The Offer further states that Polaroid is exploring various ways to distribute all or part of the Kodak recovery to Polaroid shareholders, but cautions that nothing has been decided as yet.[9] *Id.* at 22–23.

With respect to Shearson's opinions as to the inadequacy of Shamrock's offers, the Polaroid Offer discloses that Shearson "did not independently value the Company's claim for damages in the Kodak Litigation, but instead, with the Board's consent, used estimates made by independent securities analysts in reports published since May 1, 1988, and in so doing assumed the Company's anticipated recovery to be at least $1.2 billion, the midpoint of those estimates." Offer at 22.

In bold print, the Offer states that "[t]he Company does not make any representation as to the amount of any potential recovery from Kodak or when any such recovery may be obtained." [10] *Id.* at 23. Following

---

**8.** The Offer further states: "Similarly, a bidder who, because of its short-term financial needs, intends to negotiate a prompt settlement of the Kodak Litigation, may be willing to sacrifice a significant portion of the full potential recovery of such litigation." Offer at 10.

**9.** In this regard, the Offer discloses that:
Among the alternatives being studied are the assignment of all or a part of the Company's rights against Kodak to a trust (subject to the obligations under the Credit Agreement described in Section 11 and any portion of the Kodak recovery the Company may decide is appropriate to pay to the Company's employees)....
Offer at 22. Section 11 is entitled "Source and Amount of Funds" and discloses that Polaroid's Credit Agreement with the banks financing the repurchase requires that "[t]he first $300 mil-

lion of the net after-tax cash proceeds" from the Kodak litigation, less certain prepayments, must be applied to repay certain loans extended under the Credit Agreement. Offer at 48.

**10.** The Offer also warns that:
[D]ue to the inherent uncertainty of litigation, it is not practicable to predict the amount of damages that may ultimately be awarded to the Company. It is also not practicable to predict when any recovery in the Kodak Litigation will be finally realized by the Company. Unless the Company and Kodak reach an out-of-court settlement, as a result of the normal trial and appellate process any judgment as to damages may not become final for several years. The Company reserves the right to enter into a settlement with Kodak at any time for whatever amount the Company determines is appropriate.
Offer at 22.

this disclaimer the Offer presents four tables showing dollar amounts of after-tax, per-share proceeds of various levels of potential recovery in the Kodak litigation. *Id.* at 23–25. In the explanation preceding the tables, the Offer notes that "the tables are only a mathematical tabulation and do not indicate what amount of recovery is likely. The tables are not intended to suggest, and should not be interpreted to suggest, that the middle of the range reflects a correct anticipation of the ultimate recovery or that the ultimate recovery will be within the ranges indicated or will be obtained at any of the assumed dates of recovery." *Id.* at 23. The tables contain a broad range of per-share figures, from as low as $1.54 per share to as high as $73.24 per share. They cover a range of total recovery from $400 million to $6.4 billion.

Shamrock contends that the tables are "intended to suggest to shareholders that the high per-share amounts shown are amounts that they are likely to receive— pursuant to Polaroid's 'announced policy of utilizing any Kodak recovery to enhance short-term value'—if they either (1) retain their Polaroid shares or (2) sell their shares into the Self-Tender and then use the proceeds to buy more Polaroid shares." Shamrock Mem. at 51. In summary, Shamrock argues that Polaroid "now dangles the prospect of large but undefined rewards to shareholders if they will stay the course with present management, but shareholders are not told what Polaroid purports to know." *Id.* at 47.

Shamrock specifies a number of items regarding the Kodak judgment that it alleges should have been disclosed in the Offer: that Polaroid's directors made judgments about the value of the Kodak recovery in considering (and rejecting) the Shamrock offers in September 1988 and January 1989; that the directors made judgments that the value of the Kodak recovery is in excess of $1.2 billion; that management has internally utilized a $1.5 billion estimate of the litigation proceeds; that Polaroid has selectively disclosed to analysts its view that $4 billion is an "easy" recovery

and evidence concerning the possibility of punitive damages; and past negotiations concerning settlement.

Shamrock insists that at least some of this alleged knowledge on the part of Polaroid is "material nonpublic information" that constitutes inside information. According to Shamrock, Polaroid must either disclose this information or refrain from trading in the stock. *See SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

Polaroid responds by arguing that it has no material, undisclosed inside information and that the amount of the Kodak judgment is inherently uncertain at this point. It asserts that speculation about the judgment is "soft" information that has not ripened into fact and that need not be disclosed under the securities laws.

The Third Circuit clarified the law of disclosure of appraised asset valuations, projections and other "soft" information in *Flynn v. Bass Brothers Enterprises, Inc.,* 744 F.2d 978 (3d Cir.1984). Courts are to determine whether there is a duty to disclose asset valuations and other soft information on a case-by-case basis, "by weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note." *Id.* at 988 (footnote omitted). The factors a court must consider in making such a determination are: the facts upon which the information is based, the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information. *Id.*

The Court finds no support for Shamrock's assertion that "Polaroid stockholders are being asked to make critical investment decisions while they are grossly un-

informed about what is supposed to be Polaroid's most valued asset." Shamrock Mem. at 44. The potential damages award in a major patent case is an undeniably uncertain amount. No one really knows at this point how much the judge in the Polaroid–Kodak patent case will award and whether he will find the evidence sufficient to support a finding of wilfulness, with the resultant possibility of treble damages. A judge has a great deal of discretion in determining such damages.

Shamrock would have this Court believe that Polaroid is in possession of a figurative "black box" containing material, non-public information as to the potential recovery from Kodak. The Court is unconvinced. The fact that the Polaroid directors have carefully monitored the Kodak litigation over its 13–year history is not evidence that they have withheld information. The directors' fiduciary duties require no less than they continue to analyze the potential Kodak recovery. Out-of-context, hearsay statements from Polaroid directors regarding their views of the judgment would be as potentially misleading as they would be illuminating. Moreover, disclosure of assessments by Polaroid's officers, directors or advisers could seriously weaken Polaroid's bargaining position.

Similarly, ongoing communications between Polaroid and its patent counsel and information regarding the status of settlement talks have the same potential to mislead as they do to help a shareholder make a considered decision whether to tender. Also, the nature of litigation demands that certain communications with trial counsel and ongoing discussions regarding settlement not be disclosed. To require comprehensive disclosure of such information would be to hamstring Polaroid in its efforts to maximize its judgment against Kodak.

Polaroid's statement in the Offer and elsewhere that the sale of Polaroid at this time is inappropriate in part because third parties are likely to undervalue the Kodak

judgment does not necessarily mean that Polaroid is withholding material information. Rather, one could read that statement to mean that management deems a sale inappropriate while the company is sitting on a potentially huge, but as yet unrealized, asset.

One can imagine the difficulty Polaroid had in deciding how much information regarding the Kodak judgment to disclose in the Offer. The Court thinks it likely that a more selective disclosure or a more complete disclosure would also have been attacked by Shamrock. Upon application of the *Flynn* factors and the materiality standard, the Court finds that the disclosure by Polaroid was sufficient—the Offer described the history of the litigation, its current status and the parties' positions as to damages. It presented a number of tables to indicate a range of per-share, after-tax dollar amounts based on various *possible* recoveries, and did not purport to predict an outcome or guarantee that a certain amount would be passed on to shareholders. Moreover, the applicable section of the Offer is replete with warnings about the uncertainty of the amount of recovery.

### B. *Projections*

Shamrock alleges that the projections in the Offer are misleading and that material information concerning those projections is omitted. Shamrock objects to Polaroid's having projected exceptional sales and profits for the next six to seven years, while omitting Polaroid's contrastingly lackluster record for the same number of years in the past. Shamrock also objects to Polaroid's having failed to disclose and explain the assumptions underlying the projections. Specifically, Shamrock objects to the projections on three grounds: the omission of historical data on financial performance; the failure to explain and quantify the assumptions underlying the projections; and the inclusion of misleading information in the strategic and economic assumptions.[11]

---

**11.** In its briefs, Shamrock urges upon the Court numerous bases for finding the projections in the Offer misleading. The Court will address only certain of them in this section. As to the others, the Court finds they have no merit.

As required by the SEC in Schedule 13E–4, 17 C.F.R. § 240.13e–101, Polaroid has included in the Offer a consolidated statement of earnings data, for 1987 and 1988. This statement shows, *inter alia*, the change in net sales and operating profits from 1987 to 1988. Offer at 27.[12] In addition to the historical data for 1987 and 1988, Polaroid includes projections of its future financial performance for the years 1989 through 1995.

Polaroid projects sales to grow 12% in 1989 and 13.8% in 1990. *Id.* at 30. Operating profits for 1989 are projected to increase 45.8% in 1989 and 39.1% in 1990. *Id.* at 30. For the years 1990 to 1995, both profits and sales are projected to grow at a compounded annual rate "in the range of 12% to 16%." *Id.* at 33.

Shamrock contends that Polaroid's inclusion of such optimistic forecasts for seven years into the future is misleading in view of the company's historical performance. Since 1979, Polaroid's sales have grown at an average rate of only 3% per year, the growth rate for operating profits has been "essentially flat" and operating margin has never exceeded 10%. PX 1 (Polaroid Fact Book and Financial Summary 1977–1987).

In the Offer, Polaroid outlines its "Strategic and Economic Assumptions" upon which its projections are based. Offer at 31–34. In this section, Polaroid describes in narrative terms some of its plans for conducting its business in the next few years. For instance, it describes its intention to begin marketing a line of conventional 35mm film; its plan to introduce a new generation of film for its instant cameras, and a new camera line; and its plan to develop a line of electronic imaging products, medical imaging products and holographic imaging products.

Shamrock claims that such disclosures do not cure the financial projections of their misleading quality because Polaroid fails to quantify the effect that it expects each of its intended areas of business to have on its rate of growth in sales and profits. In support of this proposition, Shamrock points to internal—but not publicly disclosed—information that indicates that Polaroid expects a substantial percentage of its projected growth to come from new lines of business, e.g., sales of 35mm film, and from as-yet-undeveloped products and technology. PX 38 (Polaroid Corp. Projected Financial Statements).

Specifically, Shamrock points out that almost one-half of Polaroid's projected growth in sales is expected to come from sales of conventional 35mm film.[13] At present, 80% of the 35mm film sold in the U.S. is sold by Kodak and 10% by Fuji. Polaroid has yet to enter the domestic market. It is Shamrock's position that Polaroid's projections of earnings and sales are misleading, unless shareholders are appraised of the role that Polaroid expects 35mm film sales to play in its future performance, and the competition that Polaroid faces when it enters that market.

Shamrock also objects to the omission of information illustrating two material facts: the decline over the past ten years in the instant consumer photography business—Polaroid's primary business—and the lack of success that Polaroid has experienced in the past introducing new products and meeting financial projections.

In the section entitled "Enhance Profits", Polaroid projects a saving of $80 million as a result of reduction in work force. Offer at 31. Shamrock claims this information is misleading in light of Polaroid's knowledge that $30 million of that amount will be offset by pay increases and additional hiring. Polaroid also reveals a plan to "redi-

---

**12.** For the percentage figures cited in this opinion, the Court relies on Shamrock's calculations, some of which the Court has double-checked, and some of which it has not. Nevertheless, because Polaroid has at no time disputed any of the figures offered by Shamrock, and because the precise figures are not as important as the ranges they represent, the Court will assume them to be correct.

**13.** Shamrock claims that the "almost one-half" figure applies to sales growth through 1995. Shamrock Reply Mem. 17–18. At oral argument, counsel for Polaroid stated that "almost one-half" applies to sales-growth projections only for the period through 1990.

rect" marketing expenses. In fact, Shamrock says, Polaroid's plan is to cut marketing expenses, a fact that is material to shareholders in light of Polaroid's projections of sales increases (and a planned—but undisclosed—price increase).

Polaroid's response to these claims by Shamrock fall into three categories. First, Polaroid claims that it was required by law to include the projections in the Offer. Polaroid Mem. at 36. Second, it claims that the projections and explanatory information are not materially misleading in and of themselves and do not omit material information. Third, Polaroid claims that any material information not included in the Offer is available and easily accessible to shareholders.

 The Court dispenses with Polaroid's first contention because it is irrelevant whether this Court would find under the standards of *Flynn v. Bass Brothers Enterprises, Inc., supra,* that the "soft" information found in Polaroid's projections is required disclosure. Having disclosed those projections, Polaroid has an affirmative duty to provide any additional information required to prevent such "soft" information from being misleading. Therefore, the inquiry remains the same: Are the Polaroid projections misleading absent the additional explanatory information suggested by Shamrock? [14]

Polaroid's answer to Shamrock's objection that additional historical financial data should be included in the Offer is two-fold. First, Polaroid claims that because the figures disclosed for 1987 and 1988 reveal only slight growth in sales and profits, they sufficiently disclose that the projections for 1989 through 1995 "show a significant upturn from the past." Polaroid Mem. at 45. Second, Polaroid points out that a complete financial summary of the company's performance over the past ten years was published in Polaroid's annual report in 1987. Polaroid suggests that because the information was "previously dis-

seminated" and is "readily accessible", it should be considered part of the total mix of information available to shareholders. Polaroid Mem. at 46.

To Shamrock's contentions that the Offer fails to explain and quantify the assumptions underlying the projections, Polaroid answers that a detailed explanation of the relevant strategic and economic assumptions accompanies the financial projections. In addition, lengthy disclaimers and explanations of the limitations of the projections are included. In this way, Polaroid claims, shareholders are given a balanced view of the projections and as a result will be able to make fully informed judgments as to the likelihood that projected growth will be achieved. *Id.* at 32–33.

Considering the total mix of information given by the projections in the Offer, the Court finds that Polaroid has not included misleading information or omitted material information. As regards the lack of historical data, the Court believes the contrast between the 1987–88 data and the 1989–95 projections is sufficient to put shareholders on notice that management's projections are optimistic, and a departure from past results. In regard to the assumptions underlying the projections, the Court find the narrative descriptions of Polaroid's plans for new and existing businesses and technologies are sufficient to inform shareholders of the importance that new technologies and markets play in Polaroid's forecasts of future performance.

As to the projections of savings and the "redirecting" of marketing expenses, the Court finds that Polaroid's statement's concerning those subjects are not misleading, nor do they omit material information. They offer a reasonable description of management's projections, and the Court does not believe that further presentation of the figures underlying these projections would add to the stockpile of information that a reasonable shareholder will use when deciding whether to tender.

**14.** In the same way, the Court does not consider relevant the SEC's Safe Harbor Rule for Projections, Sec. Act Rel. No. 6084 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,117 (June 25, 1979). The liability of Polaroid and its directors for statements made in the Offer is not at issue in this case.

## C. *Blended Value*

■ Shamrock next argues that Polaroid's Offer is a response to Shamrock's offer and that the Polaroid Offer contains materially misleading and omissive disclosures concerning the true value of Polaroid's response. Polaroid admits in the Offer that its self-tender offer is "a partial response to the Shamrock Offer, which the Company has rejected." Offer at 12. The value of Shamrock's offer is apparent—$45 in cash for all shares.

Because it is only a partial offer, the value of the Polaroid Offer is not immediately clear from the face of the Offer. As noted, the Offer is an offer to purchase for cash up to 16 million (22% of the outstanding shares) shares at $50 per share. In valuing the Offer, a Polaroid shareholder would reasonably consider two components: (1) $50 in cash for 22% of one's stock and (2) the market price of the "stub shares," i.e., the 78% of one's shares remaining after completion of the self-tender, assuming that all shares have been tendered.[15] Assuming a stockholder tenders to Polaroid, the self-tender thus results in the present Polaroid shares being converted into a combination of cash and the stub shares. The average of the price offered in the self-tender offer and the predicted post-transaction market price of the remaining outstanding shares is the "blended value" of the self-tender. *Gelco Corp. v. Coniston Partners,* 652 F.Supp. 829, 837 n. 6 (D.Minn.1986), *aff'd in part and vacated in part on other grounds,* 811 F.2d 414 (8th Cir.1987).

The parties agree that the value of the stub shares will be below the present market value of Polaroid shares.[16] How much below is a matter of dispute. Shamrock argues that the Polaroid Offer is an "alternative" to the Shamrock offer, and that the shareholders are entitled to know the relative values of both offers. The post self-tender offer value of the Polaroid shares, according to Shamrock, is a material consideration for a shareholder deciding whether to tender to Polaroid, tender to Shamrock or not tender at all.

Shamrock's allegation that Polaroid has failed to disclose that the value Polaroid is offering to shareholders in the self-tender is less than the value offered by Shamrock in its offer turns substantially on an affidavit submitted by Polaroid in the Delaware Chancery Court litigation. That affidavit, designated confidential and submitted under seal, contains a calculation of the value of the Polaroid stub shares by a financial expert retained by Polaroid. Shamrock insists that this figure results in a blended value of the Polaroid self-tender that is below the $45–per–share Shamrock offer, and that this information should have been disclosed to shareholders.

Polaroid disputes the relevance of its expert's opinion. It notes that the expert calculated only a hypothetical stub value of Polaroid stock that assumed there was no Shamrock offer outstanding and assumed that the unaffected market price for Polaroid stock would have tracked the Dow Jones Industrial Average between July 1988 and January 1989. Polaroid argues that any calculation of stub value of Polaroid shares is so speculative and uncertain as to make disclosure unnecessary and even potentially misleading.

The Court finds that the Polaroid Offer was not misleading in its failure to disclose

---

**15.** The Offer does not attempt to definitively predict the post self-tender offer value of the Polaroid shares. It does state that: "The Company is not able to predict the market prices of Shares following consummation of the Offer, although, absent an increased takeover bid by Shamrock or other parties, the Company believes the price is likely to be less than $50 per Share." Offer at 12.

Also, under the heading of "Historical and Pro Forma Financial Information", the Offer, in an effort to portray the reduced number of shares that will result from the buyback of $325 million additional shares ("Selective Buyback"), uses an "assumed price" of $38.352 per share. The Offer notes that this price is the average closing price of the shares on the New York Stock Exchange Composite Tape during January 1989. Offer at 25.

**16.** Shamrock states that this decrease in value is due to the premium over market to be paid in the self-tender (for less than one-quarter of the outstanding shares) and because of the indebtedness being incurred by Polaroid to finance the self-tender. Shamrock Mem. at 69.

the stub value of the Polaroid shares or the blended value of the self-tender.[17] Shamrock cites no case for the proposition that a company that is defending against a hostile takeover and engaging in a self-tender offer must disclose predictions about the value of the stub shares and the blended value of the overall transaction. As the range of figures bandied about by the parties indicates, no one really knows what the value of the stub shares or the blended value will be. The post self-tender offer figures for stub shares and blended value depend on market forces over which neither party has control. Polaroid should not be forced to engage in speculation as to how the market will react. To do so might itself be misleading.

Moreover, the Court does not find that Polaroid's use of the $38 dollar figure in calculating the reduced number of shares resulting from the Selective Buyback to be misleading. That figure was merely an assumption based on the market price of the shares during January 1989, and it was not represented by Polaroid to be its estimate of the stub value. The Court does not believe that a reasonable shareholder would interpret this figure to be Polaroid's prediction of stub value.

### D. *Purpose of Repurchase Plan*

The Offer states on its first page that the "objective of the repurchase plan is to deliver directly to stockholders a portion of the Company's current value while enhancing the Company's prospects for future growth in stockholder value." Offer at 1. The Offer further states that the "primary purpose" of the self-tender part of the repurchase plan "is to provide the Company's stockholders with a means of furthering their investment objectives with respect to the Shares."[18] *Id.* It is also disclosed that "the Company also evaluated and approved the Repurchase Plan, including the Offer, as a partial response to the Shamrock Offer, which the Company has rejected."[19] *Id.* at 1, 4, 12.

Item 3 of Schedule 13E–4 requires, *inter alia,* that an issuer offering to purchase its own shares disclose the "purpose or purposes of the tender offer" and certain "plans or proposals." 17 C.F.R.

---

17. This conclusion is bolstered by Polaroid's disclaimer, in bold-face on the first page of its Offer, that:

> Neither the Company nor the Board of Directors of the Company makes any recommendation as to whether any stockholder should tender any or all of his or her shares pursuant to the Company's Offer. Each stockholder must make his or her own decision as to whether to tender shares and, if so, how many shares to tender.

Offer at 1. This statement runs counter to Shamrock's assertion that Polaroid is encouraging shareholders to tender into an offer that is worth less than the Shamrock offer.

18. As to the purpose of the self-tender, the Offer also states that:

> The Offer provides stockholders who wish to realize a portion of their investment currently in cash with an opportunity to sell a portion of their Shares at a premium over recent market prices of the Shares. The Offer also is intended to provide long-term stockholders with an opportunity to increase their proportionate ownership interest in the Company, either by not participating in the Offer or by participating in the Offer and reinvesting their after-tax proceeds in additional Shares. The Company has also evaluated and approved the

> repurchase plan, including the Offer, as a partial response to the unsolicited tender offer for Shares by Shamrock Acquisition III, Inc., which the Company has rejected.

Offer at 1.

19. The Offer further states:

> Changes in the Company's capital structure resulting from the Repurchase Plan might diminish the attractiveness of the Company to certain persons interested in acquiring control of the Company, including Shamrock. In addition certain terms of the Preferred Stock and the bank financing for the Offer may make more expensive, and may impede, consummation of the Shamrock Offer and might deter certain other persons from attempting, through tender or exchange offers or by other means, to gain control of the Company, particularly persons who would finance a takeover of the Company with the Company's own assets and cash flow or who cannot consummate a tender offer without acquiring a very high percentage of the Company's voting securities. In this regard, Shamrock has publicly stated that unless the Repurchase Plan is enjoined, Shamrock's ability to complete the Shamrock Offer on its present terms may be adversely affected.

Offer at 5, 12.

§ 240.13e–101.[20]

Shamrock alleges that Polaroid's statement of primary purpose is materially false and misleading because the actual "impact of the Self–Tender and related transactions [preferred stock issuance and ESOP] is to dramatically alter Polaroid's ownership profile, such that an aggregate of 33% of the company's voting power will have been shifted from public shareholders to management-aligned hands."[21] Shamrock Mem. at 74. According to Shamrock's analysis, this purpose of altering the shareholder profile by concentrating shares in hands friendly to management in anticipation of the annual meeting should have been disclosed.

 It is well established that corporate officers and directors do not violate the federal securities laws by failing to disclose an entrenchment motive or entrenchment scheme underlying their actions. *Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1490 (D.Del. 1984). This is simply one component of the general rule that the federal securities laws do not impose a duty upon parties to publicly admit the culpability of their actions. *Id.* This rule, however, limits only the duty to publicly admit to misconduct; it does not limit a party's duty to disclose all material facts relating to the party's actions, including those that might relate to misconduct. *Id.*

To the extent that one of the purposes of the self-tender offer was to "alter the shareholder profile," as suggested by Shamrock, the Court finds that this purpose was adequately disclosed. This tortuous expression is another way of saying that Polaroid wanted to increase the number of shares held by stockholders friendly

to management as a defensive tactic against a takeover. Whether that purpose is legal under Delaware law is a question for the Chancery Court. The Court is concerned only with whether such a purpose was adequately disclosed. The Court finds that it was.

Shareholders do not review tender offer documents in a vacuum, but do so in a Darwinian corporate world where hostile takeover battles "often resemble a corporate form of feudal warfare." *Warner Communications*, 581 F.Supp. at 1485. It is no secret that companies often engage in defensive tactics when faced with an undesired takeover bid. *Id.* at 1492. In this respect, courts have often held that investors are charged with knowledge of the "universal" interest of corporate officers and directors in maintaining corporate control. *Id.* Beyond this general knowledge as to the adversary nature of corporate-control struggles, the shareholders in this case have had the benefit of regular media coverage of Shamrock's continued effort to acquire Polaroid. For instance, one financial newspaper specifically noted that "[t]he move [Polaroid's self-tender] is part of a continued effort to resist a hostile takeover proposal." Wall Street Journal, February 21, 1989.

A shareholder would have to be rather naive, then, not to realize that a purpose of the Polaroid self-tender offer was to fend off Shamrock. One can quibble about the use of the phrase "partial response" to describe Polaroid's purpose in this regard. Crediting the shareholder with more intelligence than does Shamrock, the Court finds that a reasonable Polaroid shareholder would realize the defensive nature of the self-tender offer. The Court does not find

**20.** Item 3 of Schedule 13E–4 requires disclosure of "any plans or proposals which relate to or would result in", among other things:

(a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer; ...

(d) Any change in the present board of directors or management of the issuer ...; ...

(e) Any material change in the present dividend rate or policy, or indebtedness or capitalization of the issuer; ...

(g) Changes in the issuer's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the issuer by any person; ...

17 C.F.R. § 240.13e–101.

**21.** Shamrock arrives at this figure by aggregating the shares held in the Polaroid ESOP, the preferred shares issued to Corporate Partners and the shares acquired by Polaroid pursuant to the self-tender and selective repurchase.

Polaroid's failure to label this its primary purpose to be materially misleading.

### E. *Corporate Partners*

■ The alleged lack of disclosure as to Corporate Partners is closely related to the allegations regarding the purpose of the Offer. Shamrock argues that the Offer should have disclosed "what Corporate Partners is, how it represented itself to Polaroid and the fact that it has committed itself to support Polaroid management." Shamrock Mem. at 77. In short, Shamrock charges that Corporate Partners—"incumbent management's handpicked 'white squire'"—was given a sweetheart deal in an effort to defend against Shamrock, and that this relationship between Corporate Partners and Polaroid management should be disclosed.

Under the heading "Preferred Stock Private Placement", the Offer describes in detail the financial terms of Polaroid's sale of six million shares of voting preferred stock to Corporate Partners. Offer at 52–56. Among other things, this section discloses the voting rights of the shares, the dividends to be received and the fact that Corporate Partners received the power to designate two new Polaroid directors. Offer at 53. Polaroid argues that this information, read in conjunction with the media coverage given Corporate Partners' investment in Polaroid, provides shareholders with sufficient material information regarding Corporate Partners.

Corporate Partners marketed itself to Polaroid as a friend to management. In a descriptive brochure that Corporate Partners furnished to Polaroid management on September 19, 1989, Corporate Partners described itself as an investment partnership "organized to make friendly investments, usually by taking large minority equity positions of approximately 10% to 30% in pub-

licly held companies which could benefit from the presence of a large supportive shareholder...." Corporate Partners further promoted itself in the same document as: "able to provide insulation from market operators and hostile acquirors"; "designed to take a company out of play while management executes its business and financial plan"; and capable of giving a company "the ability to say no to raiders and hostile acquirors...." PX 23 at 1–6.

The Court cannot accept Shamrock's insistence that "the specific facts surrounding Corporate Partners' self-promotion as a friendly investor" be disclosed in the Offer. While material, this friendliness on the part of Corporate Partners is widely known. There has been widespread press coverage about the establishment of Corporate Partners and its investment in Polaroid.[22] In light of this extensive media coverage of Corporate Partners, Polaroid should not be compelled to re-emphasize what is already public information. Disclosure of more specific facts as to Corporate Partners would not affect the "total mix" of information available to Polaroid shareholders.

Also, as noted in this Opinion in the section regarding the purposes of the self-tender, the Offer is not silent on the effect of the Corporate Partners' transaction. The Offer states at least twice that "certain terms of the Preferred Stock [issued to Corporate Partners] and the bank financing for the Offer may make more expensive, and may impede, consummation of the Shamrock Offer...." Offer at 5, 12.

### F. *Further Defensive Transaction*

■ On January 25, 1989, Polaroid, in announcing its rejection of the Shamrock offer, disclosed that negotiations with third parties regarding the issuance of preferred stock would continue and that discussions

---

**22.** *See, e.g.,* Wall Street Journal, Nov. 15, 1988, at 23 (Business World column); Wall Street Journal, Jan. 31, 1989, at 3; N.Y. Times, Feb. 24, 1989, at D1. In its brief in the pending Chancery Court litigation, Shamrock itself quotes numerous other press reports of the Polaroid–Corporate Partners relationship and admits that "newspaper accounts of Corporate Partners' deal with Polaroid demonstrate that Corporate Partners is seen as the 'friendly hands' of Polaroid's management." Shamrock Mem. in Support of Motion for Preliminary Injunction at 12, *Shamrock v. Polaroid Corp.,* No. 10582 (Del.Ch.) (brief filed February 16, 1989).

with other parties "may be commenced." [23] Shamrock interprets these statements by Polaroid to mean that Polaroid plans to further alter the shareholder profile by issuing additional voting preferred stock to a buyer friendly to Polaroid management. These plans, according to Shamrock, must be disclosed in the Offer pursuant to Item 3(g) of Schedule 13E–4, 17 C.F.R. § 240.13e–101.[24] Polaroid argues that it has no duty to disclose the mere possibility that it may issue more preferred stock.

The federal securities laws do not impose a duty to disclose information regarding current or future plans that are uncertain and contingent in nature. *Warner Communications,* 581 F.Supp. at 1491. This principle is grounded in the concern that it might be just as misleading to investors to disclose contingent plans as it might be to fail to disclose such plans. *Id.; see also Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240, 247 (8th Cir.1979). Courts have thus tended to apply a strong presumption against imposing liability under the federal securities laws for failing to publicly disclose plans that are contingent in nature. *Warner Communications,* 581 F.Supp. at 1491.

In *Warner Communications,* this Court held that any strategy by a target corporation's management "to issue a block of stock to a friendly party in the event of a hostile takeover bid did not require disclosure at the mere planning stage, regardless of the strength of management's commitment to ultimately follow through with the defensive tactic." *Id.* Polaroid's negotiations and discussions regarding the issuance of additional preferred stock are still in the planning stage and have not yet ripened into agreements. The Court thus finds *Warner Communications* controlling, and will not order additional disclosure on this ground.

### G. *Premature Proxy Solicitation*

Under Section 14(a) of the Exchange Act and SEC Rule 14a–11(e) promulgated thereunder, 17 C.F.R. § 240.14a–11(e),[25] after a proxy contest has been commenced but before a contestant has furnished its written proxy statement to shareholders, any written soliciting material proposed to be sent or given by such contestant to security holders must be filed with the SEC, in preliminary form, at least five business days before definitive copies of such material are first sent or given to security holders. A solicitation includes, *inter alia,* any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." SEC Rule 14a–1, 17 C.F.R. § 240.14a–1. In determining whether a communication is "reasonably calculated" to influence the shareholder vote, the courts look to the purpose of the communication and the totality of circumstances in which it was made. *Long Island Lighting Co. v. Barbash,* 779 F.2d 793, 796 (2d Cir.1985). A communication to shareholders "may constitute a proxy solicitation, even if it does not contain an express request for a proxy, if it is part of a 'continuous plan' intended to end in solicitation and to prepare the way for success." *Trans World Corp. v. Odyssey Partners,* 561 F.Supp. 1315, 1319 (S.D.N.Y.1983) (quoting *SEC v. Okin,* 132 F.2d 784, 786 (2d Cir.1943)); *Gulf Corp. v. Mesa Petroleum Co.,* 582 F.Supp. 1110, 1116 (D.Del.1984).

Notwithstanding explicit statements in

---

**23.** Additionally, in the Certificates of Designation for the preferred stock issued to Corporate Partners, certain of Corporate Partners' rights are expressly made subject to Polaroid's right to issue an additional $300 million of voting preferred stock to an "industrial buyer ... in connection with a material commercial arrangement or relationship" with Polaroid.

**24.** *See supra* note 20.

**25.** Rule 14a–11(e) provides:

Three copies of any soliciting material proposed to be sent or given to security holders prior to the furnishing of the written proxy statement required by § 240.14a–3(a) shall be filed with the Commission in preliminary form, at least five business days prior to the date definitive copies of such material are first sent or given to security holders, or such shorter period as the Commission may authorize upon a showing of good cause therefor. 17 C.F.R. § 240.14a–11(e).

the Offer to the contrary [26], Shamrock contends that the Offer contains proxy solicitation material that should have been precleared with the SEC. It bases this contention on a number of statements in the Offer. One basis is the inclusion of highly optimistic projections regarding Polaroid's financial prospects. Shamrock argues that Polaroid was not required by the securities laws or regulations to include such projections, and that, by including them, Polaroid has in effect solicited proxies.

The parties' arguments on the issue of proxy solicitation are remarkable for their lack of legal authority. Beyond its disclaimer contained in the Offer, Polaroid relies chiefly on *Radol v. Thomas*, 772 F.2d 244 (6th Cir.1985).[27] The *Radol* court, however, did not address the question of simultaneous tender offers and proxy solicitations. Sirignano & Baltz, 2 Insights: Corp. & Sec.L.Advisor, Dec. 1988, at 7. These authors, both SEC officials,[28] state that the SEC has *not* applied the broad definition of solicitation in the context of simultaneous tender offers and proxy contests. *Id.* They attribute this to the substantial protection already provided to shareholders by the tender offer rules and the reluctance on the part of the Commission to require the prefiling of potentially sensitive information, with its resultant delay in dissemination. *Id.*

However, that is not to say that tender offer materials may never be treated as proxy solicitations. Sirignano and Baltz state that:

> Where the tender offer material contains statements beyond that fairly required to comply with these disclosure requirements, however, and begins arguing the merits of a proposal or challenging the performance of the subject company's or bidder's management, the staff has taken the position that the statements should have been filed in accordance with the proxy rules.

*Id.* at 8.

The Court finds that, regardless of whether the projections were required to have been included in the Polaroid Offer, the Offer was not "reasonably calculated" to influence the shareholder vote in the proxy contest between Shamrock and Polaroid. Polaroid's statement in the Offer that the document does not constitute a proxy solicitation is not controlling. Rather, the Court looks to the document as a whole, read in light of the circumstances. While these circumstances include an ongoing proxy contest, that does not make the Offer a solicitation for proxies. The Court does not read Polaroid's disclosure regarding the Kodak judgment and the optimistic projections for the company as "campaign promises to shareholders by incumbent management." Shamrock Mem. at 86. Nor does it believe that a reasonable shareholder would read the document as an attempt by Polaroid to solicit his or her vote.

**26.** The Offer states in bold-face:
> This Offer to Purchase does not constitute a solicitation of proxies from stockholders by the Company, and solicitation of such proxies by the Company will only be made pursuant to the Company's proxy materials to be filed with the Commission and to be furnished to the Company's stockholders as required by the Commission's proxy rules.
> Offer at 11.

**27.** *Radol* involved a complex two-step takeover. The plaintiffs argued that, because the tender offer and merger were represented by the defendants as a 'unitary transaction,' the defendants' tender offer materials constituted solicitations to shareholders with respect to the proposed merger, and should have contained all the information § 14(a) required to be included in a proxy statement. 772 F.2d at 253. The Sixth

Circuit held that dissemination of tender offer materials in such a two-step takeover did not require compliance with the proxy rules. *Id.* at 254. The court agreed with the district judge's statement that: "[A] tender offer and subsequent merger are distinct acts with separate concerns toward which the securities laws and SEC rules are directed in their regulatory schemes." *Id.* (quoting 556 F.Supp. 586, 591 (S.D.Ohio 1983)).

**28.** Sirignano was Chief of the Office of Tender Offers in the Division of Corporation Finance of the SEC, and Baltz was the Deputy Chief in the same Office. The authors prefaced their article with the statement that "[t]he views expressed herein are those of the authors and do not necessarily represent the view of the Commission or its staff." Sirignano & Baltz, 2 Insights: Corp. & Sec.L.Advisor, Dec. 1988, at 3.

Polaroid's Offer is subject to extensive disclosure mandates in the regulatory scheme governing tender offers. That scheme has its own filing, disclosure and dissemination requirements. The Court finds that these rules sufficiently protect shareholders here from any misleading statements in the Offer, and that the Offer does not implicate the regulations governing proxies.

## IV. CONCLUSION

The four elements necessary to obtain a preliminary injunction are not present in this case. Shamrock has not demonstrated a reasonable probability of success on its claims under Sections 13(e), 14(a) or 14(e). Nor has it shown that it will be irreparably harmed *pendente lite* as a Polaroid shareholder if equitable relief is not granted. The additional considerations of potential harm to third parties and the public interest, to the extent they are relevant, do not weigh in favor of injunctive relief.

For the foregoing reasons, Shamrock's Motion for a Preliminary Injunction is denied.

An Order is issued in accordance with this Opinion.